Steven E. KLIG, Plaintiff,

v.

DELOITTE LLP, Deloitte Tax LLP and Deloitte & Touche LLP, each a Delaware Limited Liability Partnership, Defendants.

C.A. No. 4993–VCL.

Court of Chancery of Delaware.

Submitted: Sept. 20, 2011.
Decided: Nov. 21, 2011.

Richard R. Wier, Jr., Michele D. Allen, Wier & Allen, P.A., Wilmington, Delaware; Attorneys for Plaintiff.

Paul J. Lockwood, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Attorney for Defendants.

## OPINION

LASTER, Vice Chancellor.

Plaintiff Steven Klig was terminated as a partner of Deloitte LLP and Deloitte Tax LLP after he pled guilty to a criminal charge relating to allegedly stalking and harassing an ex-lover. After learning of his arrest, Deloitte management placed Klig on an unpaid leave of absence. When Klig later asked to return to work, Deloitte management decided to resume paying Klig his approximately $1.4 million in annual compensation, but otherwise would not allow him to come into the office or to resume his practice. In this action, Klig contends that management lacked the authority to act as they did, resulting in Klig's wrongful disassociation from the Deloitte partnerships and breaches of the Deloitte partnership agreements. To remedy these wrongs, Klig seeks a multi-million dollar damages award. The parties have cross-moved for summary judgment. I grant the defendants' motion and enter judgment against Klig.

## I. FACTUAL BACKGROUND

The copious factual record consists of the operative partnership agreements, minutes, extensive email records, deposition transcripts, affidavits, and a detailed criminal complaint that the United States Attorneys' Office filed against Klig in the United States District Court for the Southern District of New York (the "Indictment"). Although the parties joust over various minor issues of fact, the material facts are undisputed.

### A. Deloitte's Structure And Klig's Place In It

Between 2003 and 2005, the international accounting giant known colloquially as Deloitte sought to limit its legal risk and potential liability by compartmentalizing its businesses across a complex structure of separate entities. As described by Deloitte's website, " 'Deloitte' is the brand under which tens of thousands of dedicated professionals in independent firms throughout the world collaborate to provide audit, consulting, financial advisory, risk management and tax services to selected clients." About Deloitte, http://www.deloitte.com/us/about (last visited October 27, 2011). The ultimate parent entity is non-party Deloitte Touche Tohmatsu Limited ("DTTL"), a private company organized under the laws of the United Kingdom. DTTL does not itself provide services to clients. Rather, DTTL's member firms provide services in various countries or geographic areas, with each firm "subject to the laws and professional regulations of the particular country or countries in which it operates." *Id.*

Defendant Deloitte LLP, a Delaware limited liability partnership, is the member firm responsible for the United States. I therefore will refer to it as "Deloitte US." Like DTTL, Deloitte U.S. does not itself provide services to clients. Instead, Deloitte U.S. owns interests in operating subsidiaries also structured as Delaware limited liability partnerships. These include defendants Deloitte Tax and Deloitte & Touche LLP and non-parties Deloitte Consulting LLP and Deloitte Financial Advisory Services LLP. According to Deloitte's website,

> Deloitte [US] helps coordinate the activities of these subsidiaries. Deloitte [US] and these subsidiaries are separate and distinct legal entities. Each of these subsidiaries is organized under Delaware law, is separately capitalized, has its own Chairman and CEO and Board of Directors, and provides a distinct array of services.

> When you contract for the provision of services with one of the subsidiaries of Deloitte [US], only that subsidiary is responsible for the provision of those services and is the only entity with potential liability for any claims that may arise in connection with such services.

*Id.* An individual who might be referred to informally as a "Deloitte partner" is actually a partner in one of the Deloitte operating entities, through which the individual provides services. Under Deloitte's governance structure, each partner in a U.S. operating entity is also a partner in Deloitte US.

Plaintiff Klig became a Deloitte partner in June 1998. He practiced in Deloitte's oddly named Washington National Tax Group. Further complicating the geographical references, Klig worked out of Deloitte's New York office. Klig specialized in the partnership tax aspects of large, multi-national transactions and private equity mergers and acquisitions.

At the time he became a partner, Deloitte provided its services through a single partnership in which Klig was a member. As a result of Deloitte's restructuring, Klig became a partner in both Deloitte U.S. and Deloitte Tax. Klig contends that he also

must have been a partner in Deloitte & Touche, because he received Schedule K–1s from that entity. The defendants respond that Klig was never a partner in Deloitte & Touche. Other than naming Deloitte & Touche as an additional defendant, Klig has not focused on that partnership, and he does not make any claims or advance any arguments based on his status as a partner in it or the terms of its partnership agreement. I therefore deem him to have (i) abandoned any claims against Deloitte & Touche and (ii) conceded implicitly that the resolution of his claims against Deloitte U.S. and Deloitte Tax controls any claims he might have had against Deloitte & Touche. I will not discuss that entity further.

## B. The Internal Governance Of Deloitte U.S. And Deloitte Tax

Deloitte U.S. and Deloitte Tax are each governed by a partnership agreement, styled as a "Memorandum of Agreement" or "MOA." Taking advantage of the contractual flexibility offered by the Delaware Revised Uniform Partnership Act, *see* 6 Del. C. § 15–103(d), each partnership agreement establishes a hierarchical, quasi-corporate governance structure that departs substantially from the traditional vision of a partnership as a flat organization of peers. Most notably, each partnership agreement establishes a board of directors and confers broad operational authority on a Chief Executive Officer. As will be seen, Klig seeks to turn these governance structures against his former partners by arguing that Deloitte management failed to comply with the operative provisions of the partnership agreements.

## C. Klig Is Arrested And Charged With Stalking And Extortion.

In January 2009, the Federal Bureau of Investigation arrested Klig at his home for allegedly stalking, threatening, and harassing a woman (the "Victim") with whom he had a romantic interlude some years earlier. According to the Indictment, Klig claimed in a letter sent to the Victim in October 2008 that he possessed a secretly recorded pornographic video depicting the Victim and himself engaged in sexual activity. Klig threatened to share the recording with the Victim's husband, relatives, and neighbors if she did not agree to "a one-time reunion." Indictment ¶ 3. Klig also demanded that the Victim send him "a couple of recent nude pictures ... as a sign of good faith." *Id.* These terms were "not negotiable." *Id.* Klig subsequently established a Yahoo! email account under a pseudonym and used it to send emails to the Victim. The emails reiterated Klig's threats to reveal the pornographic video if the Victim did not provide the requested pictures.

In December 2008, the Victim contacted the FBI. Federal agents promptly took over all communications with the Yahoo! email account, traced the account to Klig, and documented his activities and whereabouts. On January 5, 2009, FBI agents arrested Klig at his home. He was subsequently charged with one count of extortion and one count of stalking.

The media pounced on the story. Two days after his arrest, the New York Post published an article entitled " 'Ex' Sex Extort Arrest." The piece identified Klig as "a partner at finance giant Deloitte" and reported that he was "busted for allegedly trying to blackmail a former lover into sending him nude photos by threatening to give her husband, neighbors and relatives what he claimed was a raunchy DVD of their past sexcapades." Similar news stories followed.

## D. Klig Agrees To A Leave Of Absence.

Deloitte management learned of Klig's arrest on January 6, 2009. Allen Thomas, Managing Partner of Partner Services for

Deloitte US, assumed day-to-day responsibility for the firm's response. Thomas worked in conjunction with Barry Salzberg, the CEO of Deloitte US, and other senior Deloitte executives. Thomas wanted Klig to resign immediately, but Salzberg took a different view. Salzberg "was pretty adamant ... [that] if [Klig] was proven innocent that he should be able to come back to work." Salzberg Dep. at 27. Salzberg decided that a leave of absence was the appropriate temporary solution.

On January 7, 2009, during a discussion with Thomas, Klig agreed to go on an unpaid leave of absence. *See* Klig Dep. at 94. During his deposition, Klig admitted that he "definitely needed time off at that moment, absolutely." *Id.* Thomas subsequently informed the board of directors of Deloitte U.S. about Klig's unpaid leave of absence, and the board ratified the arrangement at a regularly scheduled board meeting on January 14. The board of directors of Deloitte Tax ratified Klig's unpaid leave of absence on May 12.

On January 23, 2009, some two weeks into his unpaid leave of absence, Klig again spoke with Thomas. In his deposition, Klig insisted that during this call, he expressed a desire to return to Deloitte. Thomas did not recall Klig asking to return, but Salzberg remembered "a conversation about [Klig] wanting to come back to work and come off the leave of absence." Salzberg Dep. at 53. I assume for purposes of summary judgment that Klig made the request.

On January 27, 2009, after Deloitte management had discussed the January 23 conversation internally, Thomas responded to Klig by email. Thomas did not mention Klig's request to return to work. He instead reiterated Deloitte's position that Klig's leave of absence was unpaid and the "[o]nly potential for cash is to be proven innocent...." Defs.' Ex. 13. Later that day, Klig responded: "Sounds good.

Since the possibility of being proven innocent is still one of the options I am considering, I think we should likely leave this where it stands. At this point, I will continue to stay on leave pending resolution of the matter." *Id.*

On April 9, 2009, Thomas again emailed Klig and reiterated the terms of Klig's unpaid leave of absence. Klig did not respond to the April 9 email.

### E. Klig Tries To Return.

On September 9, 2009, Klig emailed Thomas, Salzberg, and Jim Orr, who was scheduled to take over as Managing Partner of Partner Services for Deloitte U.S. after Thomas's imminent retirement. Klig noted that his criminal proceeding might not go to trial for another fourteen months and expressed dissatisfaction with his unpaid leave of absence. He then gave Deloitte an ultimatum: (i) allow him to return to work on October 1, (ii) agree to his permanent retirement on disability, or (iii) submit his expulsion to a vote of the partners before October 1.

Thomas and Orr believed that Deloitte should hold a partnership vote to expel Klig. On September 30, 2009, Orr informed Klig by email that

> [t]he first option, returning to work, and the second option, going on disability, are not viable or acceptable from our perspective. Our preference ... is that you voluntarily resign immediately. Absent you taking that action, we view option # 3, expulsion by vote of the partnership, as the only viable one....

Defs.' Ex. 22. Klig responded by threatening to show up at Deloitte's offices: "I do not intend to voluntarily resign, I do not see what there is to decide regarding submitting my expulsion to a vote. Therefore, as I previously stated, I will be showing up for work at Deloitte Tax on Monday [October 5]." *Id.* Klig also informed his

supervisors in the Washington National Tax Group that he would be returning to work on October 5 unless the partners voted to expel him before then. Klig likewise notified a number of Deloitte staff that he would be returning to the office on October 5. Several staff members expressed concern at this prospect.

To address a potentially volatile situation, Orr took steps to prevent Klig from returning to work. In an email dated October 1, Orr informed Klig that "we have deactivated your access card and made arrangements for extra security to prevent you from entering the premises of Deloitte.... We are ... adamant that you not return to work." Defs.' Ex. 30. He also informed Klig that "we have recommended to leadership that they should consider proceeding with a partner vote to expel you." *Id.* In response, Klig threatened to file suit for wrongful dissociation against Deloitte if the vote was not held within two weeks.

## F. Deloitte Reinstates Klig's Compensation.

Orr next met with Salzberg and Joseph Echevarria, the Managing Partner of Operations for Deloitte US. The three generally agreed that Klig could terminate his unpaid leave of absence at any time, but they disagreed on how Deloitte should proceed. Orr believed that Klig's expulsion should be put to an immediate vote of the partners, a course of action supported by Deloitte's Office of General Counsel. Salzberg and Echevarria disagreed, believing that an expulsion vote was too harsh because Klig had not been proven guilty of the criminal allegations. Echevarria explained in an email that

> [t]his is a issue of sense of partnership not legal analysis.... What happens when a partner is accused of something else? Is the threshold [Office of General Counsel] reads the indictment and plays judge/jury? Is it when you are

indicted? Is it we decide which allegations are more important? Is it we weight the likihood of a successful vote? That's a slippery slope I wouldn't stand in front of the partners with.

Defs.' Ex. 31 (errors in original). Salzberg later explained in deposition that Deloitte partners "support each other as best as we can" and that he "did not think that bringing this particular issue to a vote, where [Klig] was not proven guilty, was the right precedent to set from a business perspective...." Salzberg Dep. at 68. Orr acquiesced.

Deloitte's Office of General Counsel had advised that if Klig were not expelled, then, "reinstating his pay, retroactive to last week when we denied him access to the premises, would put us in the best possible position relative to any cause of action he files against the Firm for wrongful disassociation...." Defs.' Ex. 31. Salzberg, Echevarria, and Orr adopted this recommendation.

Orr communicated management's decision to Klig in an email dated October 14, 2009:

> [W]e are resuming your compensation retroactive to that date [October 5, 2009]. However, as I told you by email on October 1st, you must not resume work or enter Deloitte's premises. This arrangement will continue until we agree that you will return to work or your association with Deloitte is severed in accordance with the applicable [partnership agreement], whichever occurs first.

Defs.' Ex. 32. Consistent with this decision, Klig began receiving compensation at his pre-leave level of roughly $1.4 million per year. His compensation remained at that level until June 1, 2010, when it was reduced by 90% as part of Deloitte's standard review of partnership performance.

### G.  Klig Files This Litigation.

On October 15, 2010, the day after Orr informed Klig of management's decision, Klig filed this action.  On November 13, Klig filed an amended complaint.  In substance, Klig contends that Deloitte management wrongfully placed him on unpaid leave, recognized their error by reinstating his salary, yet continued to deny him his right to participate in the partnerships' business.  Klig frames these wrongs as six separate causes of action:  (i) wrongful dissociation from the Deloitte partnerships; (ii) breach of contract against Deloitte Tax; (iii) breach of the implied covenant of good faith and fair dealing;  (iv) breach of the Delaware Wage Payment and Collection Act;  (v) breach of the duty of loyalty;  and (vi) a request for an order requiring Deloitte to return him to work at his former position.  As monetary compensation for these wrongs, Klig seeks a multi-million dollar judgment comprising the distributions withheld during his unpaid leave and the value of his pro rata share of the partnerships

### H.  Deloitte Partners Vote To Terminate Klig.

On May 24, 2010, Klig pled guilty to a superseding misdemeanor that he "intentionally accessed an unencrypted and unsecure private wireless network without permission, and by doing so, obtained contact information for a certain woman from the servers of Google via the Internet."  Defs.' Ex. 37.  After Klig pled guilty, Deloitte management proceeded with the expulsion vote.  Salzberg explained management's reasoning:

> We now [had] a situation where ... he did not deny any of the charges against him and he pled to a different—a lesser, I guess, offense.... I did not believe that it would be good for him to come back to work again.  I did not believe that we were able to reach an agreement with him to sever him from the partner-

ship.... I recommended that, at that point, to move forward with the vote.

Salzberg Dep. at 119–20.

The Deloitte board met on August 25 and 26, 2010.  Management proposed to submit Klig's expulsion to a vote of the partners pursuant to Section 7.03 of the Deloitte U.S. partnership agreement, which governs involuntary termination. The Deloitte board unanimously adopted the resolution.  The board also resolved that

> all actions previously taken by Messrs. Thomas and Orr with respect to Mr. Klig following his arrest on or about January 5, 2009, including without limitation, those concerning Mr. Klig's leave of absence, those concerning his being relieved of substantially all duties on behalf of the Partnership, and those concerning his being instructed not to return to the premises of the Partnership until further notice be, and they hereby are, approved, adopted, ratified and confirmed in all respects.

Defs.' Ex. 44.  The Deloitte Tax board passed a similar resolution on September 10, 2010.

On August 30, 2010, Salzberg and Sharon Allen, Chairman of the Board of Deloitte US, sent an email to all Deloitte partners recounting the circumstances surrounding Klig's leave of absence and requesting that they vote on severing Klig's association with Deloitte.  Votes were received from 75% of the partners, with 99% voting in favor of expulsion.  Under Section 7.05 of the Deloitte U.S. partnership agreement, the Deloitte U.S. partner vote also severed Klig's association with Deloitte Tax. On September 10, 2010, Klig was informed that his association with Deloitte U.S. and Deloitte Tax was terminated effective August 26, 2010.

## I. Klig Cites His Expulsion To Argue For A Non–Incarceratory Sentence.

Klig was sentenced on September 24, 2010. During the hearing, Klig asked for a non-incarceratory sentence in light of the "very serious collateral consequences" that he had already suffered. Defs.' Ex. 49 at 8. Klig's attorney argued that these

> consequences ... are just punishment for the conduct at issue here. Steven Klig has lost his career and its economic rewards. He has also lost his reputation and the opportunity to practice his craft.... Mr. Klig is officially unemployed and, I would submit, effectively unemployable as a result of his conduct.

*Id.* at 9. Klig's attorney did not embrace the alternative view, advanced in this action, that Klig had the right to receive millions of dollars in damages from Deloitte. At the conclusion of the hearing, the judge sentenced him to three years' probation and ordered Klig to pay $1,500 in restitution to the Victim.

## II. LEGAL ANALYSIS

Summary judgment may be granted when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). "[T]he moving party bears the burden of demonstrating both the absence of a material issue of fact and entitlement to judgment as a matter of law...." *913 N. Mkt. St. P'ship, L.P. v. Davis,* 723 A.2d 397, 397 (Del.1998). If the moving party makes this showing, the nonmovant may avoid summary judgment only by setting forth specific facts demonstrating that there is a genuine issue for trial. Ct. Ch. R. 56(e). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." *Id.*

## A. Breach Of Contract

■ Klig's central complaint is that Deloitte management breached the partnership agreements of Deloitte U.S. and Deloitte Tax on three occasions: first when they placed Klig on unpaid leave on January 6, 2009, next when they kept Klig on unpaid leave despite his request to return on January 26, and finally when they placed Klig on paid leave on October 1, but did not allow him to resume active practice. The partnership agreements for Deloitte U.S. and Deloitte Tax contain identical provisions governing leaves of absence:

> *Leave of Absence*—Based on a written request from an Active Party, the Board may grant a leave of absence from the Partnership on such terms and conditions as the Board shall determine, including the terms on which the Active Party may return to active status. A leave of absence shall not be deemed a severing of association with the Partnership for purposes of this Agreement.

Deloitte U.S. MOA § 7.04; Deloitte Tax MOA § 7.04 (the "Leave Provision"). An "Active Party" is defined in Sections 1.01 and 1.02 of the partnership agreements to include "any Partner whose association with the Partnership shall not have been severed as provided in this Agreement."

Klig argues that Deloitte U.S. and Deloitte Tax breached the Leave Provision because it was Salzberg and Thomas who decided that Klig would go on unpaid leave on January 7, 2009, rather than the boards of Deloitte U.S. and Deloitte Tax. Klig therefore disputes the validity of the unpaid leave that began on January 7, 2009. Relatedly, Klig contends that Thomas misled him by implying that the boards of Deloitte U.S. and Deloitte Tax had approved an unpaid leave. Klig asserts that he would not have agreed to an unpaid leave of absence had he known that Thomas was acting without board authority.

Klig makes similar assertions regarding the reinstatement of his compensation in October, contending that it was orchestrated Salzberg and Orr without board oversight.

In briefing this dispute, the parties have joined issue over whether the members of management had actual authority to address Klig's situation. Although the defendants have advanced strong arguments that ultimately could have proved persuasive, I need not reach them. The short answer is that management's actions were subsequently ratified by the boards of both partnerships.

■ "A board of directors [ ] may ratify acts taken by officers . . . that might not have had actual authority to take such actions." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 11.05[a], at 11–32 (2010). Chancellor Allen explained the effect of a principal's ratification of the agent's conduct as follows:

> One way of conceptualizing that effect is that it provides, after the fact, the grant of authority that may have been wanting at the time of the agent's act. Another might be to view the ratification as consent or as an estoppel by the principal to deny a lack of authority. *See* Restatement (Second) of Agency § 103 (1958). In either event the effect of informed ratification is to validate or affirm the act of the agent as the act of the principal. *Id.* § 82.

*Lewis v. Vogelstein,* 699 A.2d 327, 334–35 (Del.Ch.1997). For a principal to properly authorize the actions of an agent, the principal must have "[k]nowledge, actual or imputed, of all material facts . . . ." *Frank v. Wilson & Co.,* 32 A.2d 277, 283 (Del. 1943). The degree of information that a board needs to ratify the actions of management is a context-specific inquiry. Valid ratification does not inherently require a blow-by-blow description immediately preceding the directors' vote.

On the record presented, it cannot reasonably be disputed that that the January 14, 2009 ratification by the Deloitte U.S. board was a proper exercise of informed decision-making. Prior to the ratification vote, Thomas had discussed the Klig matter with the board's Partner Earnings and Benefits Committee, a committee made up of members of the Deloitte U.S. board, which approved Klig's unpaid leave of absence and recommended it for ratification by the board. At the January 14 board meeting, Thomas informed the directors that Klig's unpaid leave of absence had been approved by committee vote and reviewed the reputational harm that Klig's actions had caused Deloitte. The events surrounding Klig's arrest had occurred recently, attracted the attention of the New York Post, and were front-and-center in the directors' consciousness. The Deloitte board was entitled to rely on management's judgment and the involvement of trusted executives—including Deloitte's senior human services partner—in responding to a volatile personnel issue.

It also cannot reasonably be disputed that the Deloitte U.S. board properly ratified all of the actions taken by management with respect to Klig during its meeting on August 25–26, 2010. At the time, the directors were asked to consider expelling Klig. Resolutions were circulated prior to the meeting. Among the specific matters to be ratified was that Thomas and Orr, as Managing Partners of Partner Services, had "authority . . . to take appropriate action with respect to partners of [Deloitte US] who engaged in conduct that was inimical to the interests of [Deloitte US]." Defs.' Ex. 44. During the meeting, Salzberg led a "very robust discussion" which included a presentation by Orr to the board on Klig's situation and a discus-

sion of the matter by General Counsel. Salzberg Dep. at 129. The minutes reference "a full discussion" of the issues. Defs.' Ex. 44.

With respect to Deloitte Tax, it cannot reasonably be disputed that the board properly ratified all of management's prior actions on September 10, 2010. Prior to that decision, Salzberg and Allen distributed a detailed letter informing all Deloitte partners and principals of the relevant facts surrounding Klig's leave of absence and subsequent reinstatement of compensation. The Deloitte Tax board confirmed that Thomas and Orr had "authority . . . to take appropriate action with respect to partners of Deloitte Tax who engaged in conduct that was inimical to the interests of Deloitte Tax." Defs.' Ex. 45. This ratification came after Deloitte management had been dealing with the Klig matter for over twenty months and after at least four articles had been published in the popular media concerning the matter.

In addition to the three foregoing instances of ratification, the Deloitte board ratified Klig's leave of absence in connection with a blanket ratification of all prior leaves of absences on May 12, 2009. Klig has attempted to cast doubt on the level of consideration given to his case at that meeting. In light of the September 10, 2010 ratification, I need not sift through the factual disputes that this meeting raises.

■ Klig also has complained that the Deloitte U.S. and Deloitte Tax boards did not set specific terms for his leave of absence, but rather left it open-ended and indefinite. As a matter of contract, Klig reads too much into the Leave Provision. The language of that provision states only that "the Board may grant a leave of absence from the Partnership on such terms and conditions as the Board shall determine, including the terms on which the Active Party may return to active sta-

tus." This language is empowering, not limiting. It authorizes the board to set terms as a matter of discretion. It does not preclude an indefinite leave or require that the board specify "terms on which the Active Party may return to active status." The directors could have acted within their discretion by approving an open-ended leave, subject to later evaluation and reconsideration. Regardless, the record establishes that Klig's leave was not indefinite. Klig and Deloitte management both contemplated that Klig's leave would last only until the criminal proceeding wrapped up. Salzberg testified that he was "pretty adamant" that if Klig was proven innocent "he should be able to come back to work." Salzberg Dep. at 27. Klig shared this understanding and wrote in his January 27 email that "[a]t this point, I will continue to stay on leave *pending resolution of the matter.*" Defs.' Ex. 13 (emphasis added).

Klig has suggested that the boards could not ratify a material breach of the Deloitte U.S. and Deloitte Tax partnership agreements. As a threshold matter, Klig has not established a breach of the underlying partnership agreements. As noted, the defendants have strong arguments that management was authorized to act as it did. Regardless, an alleged breach centered on lack of management authority is precisely the type of breach that is curable through ratification. *See Vogelstein,* 699 A.2d at 334 (noting that ratification "contemplates the *ex post* conferring upon or confirming of the legal authority of an agent in circumstances in which the agent had no authority or arguably had no authority"). Therefore, far from rendering ratification defective, the breach alleged by Klig presents the quintessential scenario for effective ratification.

■ Klig also has asserted that the boards could not ratify management's actions because the officers did not report

sufficiently promptly to the boards. Even assuming that management's actions in response to the emergent circumstances generated by Klig's behavior were not reported to the boards with sufficient promptness, the boards could waive this infirmity.

■ Finally, Klig asserts that the ratifications were defective because the directors were interested in the decision. According to Klig, "[b]y failing to ratify, the Boards would have exposed the firm to a heightened risk of loss in this proceeding that clearly would have adversely affected each Deloitte [US] and Deloitte Tax Board member." Pls. Answering and Reply Br. 35. Klig has it backwards. Under Delaware law, interest "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984). The "interest" that Klig describes heightened the directors' sensitivity to their fiduciary responsibility, because their interests were aligned with those of the firm.

Summary judgment is therefore granted against Klig and in favor of Deloitte U.S. and Deloitte Tax on the claim for breach of the partnership agreements.

### B. Wrongful Dissociation

■ Elsewhere in his complaint, Klig recasts his breach of contract allegations as a claim for wrongful dissociation purportedly entitling him to the fair value of his interest in the partnerships. Klig's wrongful dissociation claim depends linking three provisions of the Delaware Revised Uniform Partnership Act ("DRUPA"). He first relies on Section 15–401, which states that "[e]ach partner has equal rights in the management and conduct of the partnership business and affairs." 6

Del. C. § 15–401(f). He next cites Section 15–602(b), which states that "[a] partner's dissociation is wrongful [ ] if … (1) it is in breach of an express provision of the partnership agreement…." 6 Del. C. § 15–602(b). He finally relies on Section 15–701 for the proposition that he is entitled to a buyout of the fair value of his partnership interest.

I have already held that the actions taken by Deloitte U.S. and Deloitte Tax did not breach the partnership agreements. Klig therefore has not established a "dissociation … in breach of an express provision of the partnership agreement…." 6 Del. C. § 15–602(b)(1). Accordingly, summary judgment is appropriately entered against Klig on his wrongful dissociation claim.

■ Separately, summary judgment is entered against Klig on this claim because the partnership agreements expressly eliminate the remedy otherwise potentially available under Section 15–701. Section 8.01 of the Deloitte U.S. and Deloitte Tax partnership agreements provides that "[t]he provisions contained in Articles 6, 10 and this Article 8 are intended to supersede and replace the provisions of Section 15–701 of [DRUPA]." Accordingly, Klig cannot obtain the fair value buyout that he seeks.

### C. The Implied Covenant Of Good Faith And Fair Dealing

■ Klig separately argues that the defendants violated the implied covenant of good faith and fair dealing by placing him on an indefinite leave of absence and refusing to reinstate him upon his request to return to work. "The implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to

the contract from receiving the fruits of the bargain." *Kuroda v. SPJS Holdings, L.L.C.,* 971 A.2d 872, 888 (Del.Ch.2009) (internal quotation marks omitted). A court will employ the covenant "to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 441 (Del.2005). That analysis, however, does not empower the Court to impose on the parties its own view of what would be fair or reasonable. *See Nemec v. Shrader,* 991 A.2d 1120, 1128 (Del.2010) ("Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."). Instead, the Court must view the parties' actions through the lens of their original bargaining position, with the inquiry limited to whether the parties "would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter." *Katz v. Oak Indus. Inc.,* 508 A.2d 873, 880 (Del.Ch.1986) (Allen, C.). Consequently, for purposes of the implied covenant, a party acts in good faith and reasonably when it acts consistent with the parties' "reasonable expectations at the time of contracting." *Nemec,* 991 A.2d at 1126.

Viewing Klig's claims in the most favorable light possible, I cannot fathom how the implied covenant might have been violated. It is inconceivable to me that during original-position bargaining over the terms of the partnership agreements, the parties would have decided that Deloitte U.S. and Deloitte Tax could not place on unpaid leave a partner who had been indicted for the types of shocking criminal charges that were spelled out in glaring detail in the Indictment and supported with documentary evidence and a report from the investigating officer. Had the issue been raised, I am confident that the parties would have agreed that Deloitte U.S. and Deloitte Tax could act precisely as they did. Far from acting arbitrarily or unreasonably, Deloitte's top managers strained to give Klig the benefit of the doubt, to treat him respectfully as a partner, and to ensure that he had every opportunity to resolve the allegations pending against him. Summary judgment is therefore granted in favor of the defendants on the implied covenant claim.

## D. The Delaware Wage Payment And Collection Act

■■■ Klig's complaint asserts a claim under the Delaware Wage Payment and Collection Act for wages withheld during the unpaid leave of absence. Section 1101(a)(3) of the Act limits its application to persons "suffered or permitted to work by an employer under a contract of employment either *made in Delaware* or to be *performed wholly or partly therein.*" 19 Del. C. § 1101(a)(3) (emphasis added). Klig has not offered any evidence that could satisfy the requisite Delaware nexus.

■■■ Klig did not work wholly or partly within Delaware. He instead worked out of Deloitte's New York office. To the extent Klig implicitly relies on either the Deloitte U.S. or Deloitte Tax partnership agreement as a "contract of employment ... made in Delaware," nothing suggests that either partnership agreement was "made in Delaware." Nor is there any basis to think that Delaware could enforce its vision of appropriate employment law regulation within New York's territory. As a matter of federal constitutional law, "[s]tates possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples." *DeCanas v. Bica,* 424

U.S. 351, 356, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). By adopting the Delaware Wage Payment and Collection Act, the Delaware General Assembly exercised this traditional authority. Under our federal system of co-equal state sovereigns, Delaware can readily regulate within its borders, but cannot regulate the wages of an individual working in another state, outside of Delaware's jurisdiction. *See generally Sullivan v. Oracle Corp.,* 51 Cal.4th 1191, 127 Cal.Rptr.3d 185, 254 P.3d 237 (2011). Summary judgment is therefore granted in favor of the defendants on this claim, alleviating any need to reach Klig's interesting argument that a Deloitte partner could qualify statutorily as an employee.

### E. Breach Of The Duty Of Loyalty

■ Klig's complaint asserts a claim for breach of the duty of loyalty under Section 9.02 of the Deloitte U.S. partnership agreement. The pertinent language states that "[e]ach Active Party shall be just and faithful to the Partnership and the other Active Parties in all actions...." This duty is owed by Active Parties, not by the partnership as an entity. *Cf. A.W. Fin. Servs., S.A. v. Empire Res., Inc.,* 981 A.2d 1114, 1127 n. 36 (Del.2009) ("Under Delaware law, the issuing corporation does not owe fiduciary duties to its stockholders." (citing *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 678 A.2d 533, 539 (Del.1996); *Alessi v. Beracha,* 849 A.2d 939, 950 (Del. Ch.2004))). Klig has not sued any Active Party. Summary judgment is granted in favor of the defendants on this claim.

### F. Specific Performance

The final claim in Klig's complaint sought an order of specific performance directing the defendants to "allow him to be an active partner in the Deloitte entities until he either resigns, with drawls [sic] or is involuntarily terminated...." Am. Compl. ¶ 127. This claim for relief was rendered moot when Klig was involuntarily terminated effective August 26, 2010.

### III. CONCLUSION

For the foregoing reasons, Deloitte U.S. and Deloitte Tax are entitled to summary judgment on all counts of the complaint. **IT IS SO ORDERED.**