Moise KATZ, on behalf of himself and all other similarly situated holders of Oak Industries Inc.: 9⅝% Convertible Notes due September 15, 1991, 13.50% Senior Notes due May 15, 1990, 9⅝% Notes due September 15, 1991, 11⅝% Notes due September 15, 1990, 13.65% Debentures due April 1, 2001, 11⅞% Subordinated Debentures due February 1, 2002, and 11⅞% Subordinated Debentures due May 15, 1998, Plaintiff,

v.

OAK INDUSTRIES INC., Defendant.

Court of Chancery of Delaware,
New Castle County.
Submitted: March 7, 1986.
Decided: March 10, 1986.

Norman M. Monhait of Morris & Rosenthal, P.A., Wilmington and Stuart D. Wechsler, Jeffrey A. Baumel and Zachary A.

Starr of Goodkind, Wechsler, Labaton & Rudoff, New York City, for plaintiff.

R. Franklin Balotti, Jesse A. Finkelstein, Kevin G. Abrams of Richards, Layton & Finger, Wilmington and Selvyn Seidel, Peter H. Benzian, Mark W. Smith, James E. Brandt and Karen B. Burrows of Latham & Watkins, New York City, for defendant.

## OPINION

ALLEN, Chancellor.

A commonly used word—seemingly specific and concrete when used in everyday speech—may mask troubling ambiguities that upon close examination are seen to derive not simply from casual use but from more fundamental epistemological problems. Few words more perfectly illustrate the deceptive dependability of language than the term "coercion" which is at the heart of the theory advanced by plaintiff as entitling him to a preliminary injunction in this case.

Plaintiff is the owner of long-term debt securities issued by Oak Industries, Inc. ("Oak"), a Delaware corporation; in this class action he seeks to enjoin the consummation of an exchange offer and consent solicitation made by Oak to holders of various classes of its long-term debt. As detailed below that offer is an integral part of a series of transactions that together would effect a major reorganization and recapitalization of Oak. The claim asserted is in essence, that the exchange offer is a coercive device and, in the circumstances, constitutes a breach of contract. This is the Court's opinion on plaintiff's pending application for a preliminary injunction.

## I.

The background facts are involved even when set forth in the abbreviated form the decision within the time period currently available requires.

Through its domestic and foreign subsidiaries and affiliated entities, Oak manufactures and markets component equipments used in consumer, industrial and military products (the "Components Segment"); produces communications equipment for use in cable television systems and satellite television systems (the "Communications Segment") and manufactures and markets laminates and other materials used in printed circuit board applications (the "Materials Segment"). During 1985, the Company has terminated certain other unrelated businesses. As detailed below, it has now entered into an agreement with Allied-Signal, Inc. for the sale of the Materials Segment of its business and is currently seeking a buyer for its Communications Segment.

Even a casual review of Oak's financial results over the last several years shows it unmistakably to be a company in deep trouble. During the period from January 1, 1982 through September 30, 1985, the Company has experienced unremitting losses from operations; on net sales of approximately $1.26 billion during that period (F–3)[1] it has lost over $335 million (F–3). As a result its total stockholders' equity has first shriveled (from $260 million on 12/31/81 to $85 million on 12/31/83) and then disappeared completely (as of 9/30/85 there was a $62 million deficit in its stockholders' equity accounts) (F–6). Financial markets, of course, reflected this gloomy history.[2]

Unless Oak can be made profitable within some reasonably short time it will not continue as an operating company. Oak's board of directors, comprised almost entirely of outside directors, has authorized steps

1. Parenthical references are to pages in the Offeror's Circular and Consent Solicitation appended as Exhibit No. 1 to the Monhait Affidavit.

2. The price of the company's common stock has fallen from over $30 per share on December 31, 1981 to approximately $2 per share recently. (P–38). The debt securities that are the subject of the exchange offer here involved (see note 3 for identification) have traded at substantial discounts.

to buy the company time. In February, 1985, in order to reduce a burdensome annual cash interest obligation on its $230 million of then outstanding debentures, the Company offered to exchange such debentures for a combination of notes, common stock and warrants. As a result, approximately $180 million principal amount of the then outstanding debentures were exchanged. Since interest on certain of the notes issued in that exchange offer is payable in common stock, the effect of the 1985 exchange offer was to reduce to some extent the cash drain on the Company caused by its significant debt.

About the same time that the 1985 exchange offer was made, the Company announced its intention to discontinue certain of its operations and sell certain of its properties. Taking these steps, while effective to stave off a default and to reduce to some extent the immediate cash drain, did not address Oak's longer-range problems. Therefore, also during 1985 representatives of the Company held informal discussions with several interested parties exploring the possibility of an investment from, combination with or acquisition by another company. As a result of these discussions, the Company and Allied-Signal, Inc. entered into two agreements. The first, the Acquisition Agreement, contemplates the sale to Allied-Signal of the Materials Segment for $160 million in cash. The second agreement, the Stock Purchase Agreement, provides for the purchase by Allied-Signal for $15 million cash of 10 million shares of the Company's common stock together with warrants to purchase additional common stock.

The Stock Purchase Agreement provides as a condition to Allied-Signal's obligation that at least 85% of the aggregate principal amount of all of the Company's debt securities shall have tendered and accepted the

exchange offers that are the subject of this lawsuit. Oak has six classes of such long term debt.[3] If less than 85% of the aggregate principal amount of such debt accepts the offer, Allied-Signal has an option, but no obligation, to purchase the common stock and warrants contemplated by the Stock Purchase Agreement. An additional condition for the closing of the Stock Purchase Agreement is that the sale of the Company's Materials Segment contemplated by the Acquisition Agreement shall have been concluded.

Thus, as part of the restructuring and recapitalization contemplated by the Acquisition Agreement and the Stock Purchase Agreement, the Company has extended an exchange offer to each of the holders of the six classes of its long-term debt securities. These pending exchange offers include a Common Stock Exchange Offer (available only to holders of the $9^5/8\%$ convertible notes) and the Payment Certificate Exchange Offers (available to holders of all six classes of Oak's long-term debt securities). The Common Stock Exchange Offer currently provides for the payment to each tendering noteholder of 407 shares of the Company's common stock in exchange for each $1,000 $9^5/8\%$ note accepted. The offer is limited to $38.6 million principal amount of notes (out of approximately $83.9 million outstanding).

The Payment Certificate Exchange Offer is an any and all offer. Under its terms, a payment certificate, payable in cash five days after the closing of the sale of the Materials Segment to Allied-Signal, is offered in exchange for debt securities. The cash value of the Payment Certificate will vary depending upon the particular security tendered. In each instance, however, that payment will be less than the face amount of the obligation. The cash payments range in amount, per $1,000 of prin-

---

3. The three classes of debentures are: 13.65% debentures due April 1, 2001, $10^1/2\%$ convertible subordinated debentures due February 1, 2002, and $11^7/8\%$ subordinated debentures due May 15, 1998. In addition, as a result of the 1985 exchange offer the company has three classes of notes which were issued in exchange for debentures that were tendered in that offer. Those are: 13.5% senior notes due May 15, 1990, $9^5/8\%$ convertible notes due September 15, 1991 and $11^5/8\%$ notes due September 15, 1990.

cipal, from \$918 to \$655. These cash values however appear to represent a premium over the market prices for the Company's debentures as of the time the terms of the transaction were set.

The Payment Certificate Exchange Offer is subject to certain important conditions before Oak has an obligation to accept tenders under it. First, it is necessary that a minimum amount (\$38.6 million principal amount out of \$83.9 total outstanding principal amount) of the 9⅝% notes be tendered pursuant to the Common Stock Exchange Offer. Secondly, it is necessary that certain minimum amounts of each class of debt securities be tendered, together with consents to amendments to the underlying indentures.[4] Indeed, under the offer one may not tender securities unless at the same time one consents to the proposed amendments to the relevant indentures.

The condition of the offer that tendering security holders must consent to amendments in the indentures governing the securities gives rise to plaintiff's claim of breach of contract in this case. Those amendments would, if implemented, have the effect of removing significant negotiated protections to holders of the Company's long-term debt including the deletion of all financial covenants. Such modification may have adverse consequences to debt holders who elect not to tender pursuant to either exchange offer.

Allied-Signal apparently was unwilling to commit to the \$15 million cash infusion contemplated by the Stock Purchase Agreement, unless Oak's long-term debt is reduced by 85% (at least that is a condition of their obligation to close on that contract). Mathematically, such a reduction may not occur without the Company reducing the principal amount of outstanding debentures (that is the three classes outstanding notes constitute less than 85% of all long-term debt). But existing indenture covenants (See Offering Circular, pp. 38–39) prohibit the Company, so long as any of its long-term notes are outstanding, from issuing any obligation (including the Payment Certificates) in exchange for any of the debentures. Thus, in this respect, amendment to the indentures is required in order to close the Stock Purchase Agreement as presently structured.

Restrictive covenants in the indentures would appear to interfere with effectuation of the recapitalization in another way. Section 4.07 of the 13.50% Indenture[5] provides that the Company may not "acquire" for value any of the 9⅝% Notes or 11⅝% Notes unless it concurrently "redeems" a proportionate amount of the 13.50% Notes. This covenant, if unamended, would prohibit the disproportionate acquisition of the 9⅝% Notes that may well occur as a result of the Exchange Offers; in addition, it would appear to require the payment of the "redemption" price for the 13.50% Notes rather than the lower, market price offered in the exchange offer.

In sum, the failure to obtain the requisite consents to the proposed amendments would permit Allied-Signal to decline to consummate both the Acquisition Agreement and the Stock Purchase Agreement.

As to timing of the proposed transactions, the Exchange Offer requires the Company (subject to the conditions stated therein) to accept any and all tenders received by 5:00 p.m. March 11, 1986. A meeting of stockholders of the Company has been called for March 14, 1986 at which time the Company's stockholders will be asked to approve the Acquisition Agreement and the Stock Purchase Agreement as well as certain deferred compensation arrangements for key employees. Closing of the Acquisition Agreement may occur on March 14, 1986, or as late as June 20, 1986

---

**4.** The holders of more than 50% of the principal amount of each of the 13.5% notes, the 9⅝% notes and the 11⅝% notes and at least 66⅔% of the principal amount of the 13.65% debentures, 10½% debentures, and 11⅞% debentures, must validly tender such securities and consent to certain proposed amendments to the indentures governing those securities.

**5.** See Monhait Aff., Exh. 3, p. 27.

under the terms of that Agreement. Closing of the Stock Purchase Agreement must await the closing of the Acquisition Agreement and the successful completion of the Exchange Offers.

The Exchange Offers are dated February 14, 1986. This suit seeking to enjoin consummation of those offers was filed on February 27. Argument on the current application was held on March 7.

## II.

Plaintiff's claim that the Exchange Offers and Consent Solicitation constitutes a threatened wrong to him and other holders of Oak's debt securities [6] appear to be summarized in paragraph 16 of his Complaint:

The purpose and effect of the Exchange Offers is [1] to benefit Oak's common stockholders at the expense of the Holders of its debt securities, [2] to force the exchange of its debt instruments at unfair price and at less than face value of the debt instruments [3] pursuant to a rigged vote in which debt Holders who exchange, and who therefore have no interest in the vote, *must* consent to the elimination of protective covenants for debt Holders who do not wish to exchange.

As amplified in briefing on the pending motion, plaintiff's claim is that no free choice is provided to bondholders by the exchange offer and consent solicitation. Under its terms, a rational bondholder is "forced" to tender and consent. Failure to do so would face a bondholder with the risk of owning a security stripped of all financial covenant protections and for which it is likely that there would be no ready market. A reasonable bondholder, it is suggested, cannot possibly accept those risks and thus such a bondholder is coerced to tender and

thus to consent to the proposed indenture amendments.

It is urged this linking of the offer and the consent solicitation constitutes a breach of a contractual obligation that Oak owes to its bondholders to act in good faith. Specifically, plaintiff points to three contractual provisions from which it can be seen that the structuring of the current offer constitutes a breach of good faith. Those provisions (1) establish a requirement that no modification in the term of the various indentures may be effectuated without the consent of a stated percentage of bondholders; (2) restrict Oak from exercising the power to grant such consent with respect to any securities it may hold in its treasury; and (3) establish the price at which and manner in which Oak may force bondholders to submit their securities for redemption.

## III.

In order to demonstrate an entitlement to the provisional remedy of a preliminary injunction it is essential that a plaintiff show that it is probable that his claim will be upheld after final hearing; that he faces a risk of irreparable injury before final judgment will be reached in the regular course; and that in balancing the equities and competing hardships that preliminary judicial action may cause or prevent, the balance favors plaintiff. *See, Shields v. Shields*, Del.Ch., 498 A.2d 161 (1985).

I turn first to an evaluation of the probability of plaintiff's ultimate success on the merits of his claim. I begin that analysis with two preliminary points. The first concerns what is not involved in this case. To focus briefly on this clears away much of the corporation law case law of

---

**6.** It is worthy of note that a very high percentage of the principal value of Oak's debt securities are owned in substantial amounts by a handful of large financial institutions. Almost 85% of the value of the 13.50% Notes is owned by four such institutions (one investment banker owns 55% of that issue); 69.1% of the 9⅝% Notes are owned by four financial institutions (the same investment banker owning 25% of that issue) and 85% of the 11⅝% Notes are owned by five such institutions. Of the debentures, 89% of the 13.65% debentures are owned by four large banks; and approximately 45% of the two remaining issues is owned by two banks.

this jurisdiction upon which plaintiff in part relies. This case does not involve the measurement of corporate or directorial conduct against that high standard of fidelity required of fiduciaries when they act with respect to the interests of the beneficiaries of their trust. Under our law—and the law generally—the relationship between a corporation and the holders of its debt securities, even convertible debt securities, is contractual in nature. *See, Norte & Co. v. Manor Healthcare Corp.*, Del.Ch. Nos. 6827 and 6831, Berger, V.C. (Nov. 21, 1985); *Harff v. Kerkorian*, Del.Ch., 324 A.2d 215 (1974) *rev'd on other grounds*, Del.Supr., 347 A.2d 133 (1975); American Bar Foundation, *Commentaries on Indentures* (1971). Arrangements among a corporation, the underwriters of its debt, trustees under its indentures and sometimes ultimate investors are typically thoroughly negotiated and massively documented. The rights and obligations of the various parties are or should be spelled out in that documentation. The terms of the contractual relationship agreed to and not broad concepts such as fairness define the corporation's obligation to its bondholders.[7]

▆▆▆ Thus, the first aspect of the pending Exchange Offers about which plaintiff complains—that "the purpose and effect of the Exchange Offers is to benefit Oak's common stockholders at the expense of the Holders of its debt"—does not itself appear to allege a cognizable legal wrong. It is the obligation of directors to attempt, within the law, to maximize the long-run interests of the corporation's stockholders; that they may sometimes do so "at the expense" of others (even assuming that a transaction which one may refuse to enter

into can meaningfully be said to be at his expense[8]) does not for that reason constitute a breach of duty. It seems likely that corporate restructurings designed to maximize shareholder values may in some instances have the effect of requiring bondholders to bear greater risk of loss and thus in effect transfer economic value from bondholders to stockholders. *See generally,* Prokesch, *Merger Wave: How Stocks and Bonds Fare,* N.Y. Times, Jan. 7, 1986, at A1, col. 1; McDaniel, *Bondholders and Corporate Governance,* 41 Bus.Law. 413, 418–423 (1986). But if courts are to provide protection against such enhanced risk, they will require either legislative direction to do so or the negotiation of indenture provisions designed to afford such protection.

The second preliminary point concerns the limited analytical utility, at least in this context, of the word "coercive" which is central to plaintiff's own articulation of his theory of recovery. If, *pro arguendo,* we are to extend the meaning of the word coercion beyond its core meaning—dealing with the utilization of physical force to overcome the will of another—to reach instances in which the claimed coercion arises from an act designed to affect the will of another party by offering inducements to the act sought to be encouraged or by arranging unpleasant consequences for an alternative sought to be discouraged, then—in order to make the term legally meaningful at all—we must acknowledge that some further refinement is essential. Clearly some "coercion" of this kind is legally unproblematic. Parents may "coerce" a child to study with the threat of withholding an allowance; employers may

---

7. To say that the broad duty of loyalty that a director owes to his corporation and ultimately its shareholders is not implicated in this case is not to say, as the discussion below reflects, that as a matter of contract law a corporation owes no duty to bondholders of good faith and fair dealing. *See, Restatement of Law, Contracts 2d,* § 205 (1979). Such a duty, however, is quite different from the congeries of duties that are assumed by a fiduciary. *See generally,* Bratton,

*The Economics and Jurisprudence of Convertible Bonds,* 1984 Wis.L.Rev. 667.

8. On the deeper implications of consent in the establishment of legal norms. *Compare,* Posner, *The Ethical and Political Basis of the Efficiency Norm in Common Law Adjudication,* 8 Hofstra L.Rev. 487 (1980) *with* West, *Authority, Autonomy and Choice: The Rule of Consent in the Moral and Political Vision of Franz Kafka and Richard Posner,* 99 Harv.L.Rev. 384 (1985).

"coerce" regular attendance at work by either docking wages for time absent or by rewarding with a bonus such regular attendance. Other "coercion" so defined clearly would be legally relevant (to encourage regular attendance by corporal punishment, for example). Thus, for purposes of legal analysis, the term "coercion" itself—covering a multitude of situations—is not very meaningful. For the word to have much meaning for purposes of legal analysis, it is necessary in each case that a normative judgment be attached to the concept ("inappropriately coercive" or "wrongfully coercive", etc.). But, it is then readily seen that what is legally relevant is not the conclusory term "coercion" itself but rather the norm that leads to the adverb modifying it.

In this instance, assuming that the Exchange Offers and Consent Solicitation can meaningfully be regarded as "coercive" (in the sense that Oak has structured it in a way designed—and I assume effectively so—to "force" rational bondholders to tender), the relevant legal norm that will support the judgment whether such "coercion" is wrongful or not will, for the reasons mentioned above, be derived from the law of contracts. I turn then to that subject to determine the appropriate legal test or rule.

Modern contract law has generally recognized an implied covenant to the effect that each party to a contract will act with good faith towards the other with respect to the subject matter of the contract. *See, Restatement of Law, Contracts 2d*, § 205 (1981); *Rowe v. Great Atlantic and Pacific Tea Company*, N.Y.Ct.Apps., 46 N.Y.2d 62, 412 N.Y.S.2d 827, 830, 385 N.E.2d 566, 569 (1978). The contractual theory for this implied obligation is well stated in a leading treatise:

> If the purpose of contract law is to enforce the reasonable expectations of parties induced by *promises*, then at some point it becomes necessary for courts to look to the substance rather than to the form of the agreement, and to hold that

substance controls over form. What courts are doing here, whether calling the process "implication" of promises, or interpreting the requirements of "good faith", as the current fashion may be, is but a recognition that the parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations. When the court "implies a promise" or holds that "good faith" requires a party not to violate those expectations, it is recognizing that sometimes silence says more than words, and it is understanding its duty to the spirit of the bargain is higher than its duty to the technicalities of the language. *Corbin on Contracts* (Kaufman Supp.1984), § 570.

█ It is this obligation to act in good faith and to deal fairly that plaintiff claims is breached by the structure of Oak's coercive exchange offer. Because it is an implied *contractual* obligation that is asserted as the basis for the relief sought, the appropriate legal test is not difficult to deduce. It is this: is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter. If the answer to this question is yes, then, in my opinion, a court is justified in concluding that such act constitutes a breach of the implied covenant of good faith. *See, Martin v. Star Publishing Co.*, Del.Supr., 126 A.2d 238 (1956); *Danby v. Osteopathic Hospital Ass'n.*, Del.Ch., 101 A.2d 308 (1953) *aff'd* Del.Supr., 104 A.2d 903 (1954); *Broad v. Rockwell International Corp.*, 5th Cir., 642 F.2d 929, 957 (1981).

With this test in mind, I turn now to a review of the specific provisions of the various indentures from which one may be best able to infer whether it is apparent that the contracting parties—had they negotiated with the exchange offer and con-

sent solicitation in mind—would have expressly agreed to prohibit contractually the linking of the giving of consent with the purchase and sale of the security.

## IV.

Applying the foregoing standard to the exchange offer and consent solicitation, I find first that there is nothing in the indenture provisions granting bondholders power to veto proposed modifications in the relevant indenture that implies that Oak may not offer an inducement to bondholders to consent to such amendments. Such an implication, at least where, as here, the inducement is offered on the same terms to each holder of an affected security, would be wholly inconsistent with the strictly commercial nature of the relationship.

Nor does the second pertinent contractual provision supply a ground to conclude that defendant's conduct violates the reasonable expectations of those who negotiated the indentures on behalf of the bondholders. Under that provision Oak may not vote debt securities held in its treasury. Plaintiff urges that Oak's conditioning of its offer to purchase debt on the giving of consents has the effect of subverting the purpose of that provision; it permits Oak to "dictate" the vote on securities which it could not itself vote.

The evident purpose of the restriction on the voting of treasury securities is to afford protection against the issuer voting as a bondholder in favor of modifications that would benefit it as issuer, even though such changes would be detrimental to bondholders. But the linking of the exchange offer and the consent solicitation does not involve the risk that bondholder interests will be affected by a vote involving anyone with a financial interest in the subject of the vote other than a bondholder's interest. That the consent is to be given concurrently with the transfer of the bond to the issuer does not in any sense create the kind of conflict of interest that the indenture's prohibition on voting treasury securities contemplates. Not only will the proposed consents be granted or withheld only by those with a financial interest to maximize the return on their investment in Oak's bonds, but the incentive to consent is equally available to all members of each class of bondholders. Thus the "vote" implied by the consent solicitation is not affected in any sense by those with a financial conflict of interest.

In these circumstances, while it is clear that Oak has fashioned the exchange offer and consent solicitation in a way designed to encourage consents, I cannot conclude that the offer violates the intendment of any of the express contractual provisions considered or, applying the test set out above, that its structure and timing breaches an implied obligation of good faith and fair dealing.

One further set of contractual provisions should be touched upon: Those granting to Oak a power to redeem the securities here treated at a price set by the relevant indentures. Plaintiff asserts that the attempt to force all bondholders to tender their securities at less than the redemption price constitutes, if not a breach of the redemption provision itself, at least a breach of an implied covenant of good faith and fair dealing associated with it. The flaw, or at least one fatal flaw, in this argument is that the present offer is not the functional equivalent of a redemption which is, of course, an act that the issuer may take unilaterally. In this instance it may happen that Oak will get tenders of a large percentage of its outstanding long-term debt securities. If it does, that fact will, in my judgment, be in major part a function of the merits of the offer (i.e., the price offered in light of the Company's financial position and the market value of its debt). To answer plaintiff's contention that the *structure* of the offer "forces" debt holders to tender, one only has to imagine what response this offer would receive if the price offered did not reflect a premium over market but rather was, for example, ten percent of market value. The exchange offer's success ultimately de-

pends upon the ability and willingness of the issuer to extend an offer that will be a financially attractive alternative to holders. This process is hardly the functional equivalent of the unilateral election of redemption and thus cannot be said in any sense to constitute a subversion by Oak of the negotiated provisions dealing with redemption of its debt.

Accordingly, I conclude that plaintiff has failed to demonstrate a probability of ultimate success on the theory of liability asserted.

## V.

An independent ground for the decision to deny the pending motion is supplied by the requirement that a court of equity will not issue the extraordinary remedy of preliminary injunction where to do so threatens the party sought to be enjoined with irreparable injury that, in the circumstances, seems greater than the injury that plaintiff seeks to avoid. *Eastern Shore Natural Gas Co. v. Stauffer Chemical Co.*, Del.Supr., 298 A.2d 322 (1972). That principal has application here.

Oak is in a weak state financially. Its board, comprised of persons of experience and, in some instances, distinction, have approved the complex and interrelated transactions outlined above. It is not unreasonable to accord weight to the claims of Oak that the reorganization and recapitalization of which the exchange offer is a part may present the last good chance to regain vitality for this enterprise. I have not discussed plaintiff's claim of irreparable injury, although I have considered it. I am satisfied simply to note my conclusion that it is far outweighed by the harm that an improvidently granted injunction would threaten to Oak.

For the foregoing reasons plaintiff's application for a preliminary injunction shall be denied.

IT IS SO ORDERED.