# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROUNDPOINT MORTGAGE SERVICING CORPORATION, a Delaware corporation, and RPFG HOLDINGS, INC., a Florida corporation, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0161-SG |
| FREEDOM MORTGAGE CORPORATION, a New Jersey corporation, and FMC/RADIANT MERGER SUB INC., a Delaware corporation | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  June 17, 2020
Date Decided:  July 22, 2020

Kevin R. Shannon, Christopher N. Kelly, and Daniel M. Rusk, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Andrew W. Stern, Jon W. Muenz, and Charlotte K. Newell, of SIDLEY AUSTIN LLP, New York, New York, *Attorneys for Plaintiffs and Counterclaim Defendants RoundPoint Mortgage Servicing Corporation and RPFG Holdings, Inc*.

Rudolf Koch, Kevin M. Gallagher, and Kevin M. Regan, of RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; OF COUNSEL: Edward L. Powers, Jeffrey L. Friesen, and Florence M. Craig, of ZUCKERMAN GORE BRANDEIS & CROSSMAN, LLP, New York, New York, *Attorneys for Defendants and Counterclaim Plaintiffs Freedom Mortgage Corporation and FMC/Radiant Merger Sub Inc*.

GLASSCOCK, Vice Chancellor

Before me is a limited issue of contract construction, in way of a merger agreement. The merger consideration here is, in my experience, unusual. The buyer is obligated to pay book value plus a premium (minus a fixed amount). The issue before me concerns a provision in the merger agreement contemplating that, during the period between signing and closing, the controlling stockholder of the target would extend credit to the target; as a condition to closing the target, the parties agreed, "shall have repaid" any such credit "outstanding" to its controlling stockholder.

Here, the controlling stockholder made substantial loans to the target, forgave all but $1 million, and the target attempted to proceed to closing. The parties disagree about the application of the contractual language to these facts. The Plaintiffs here, the target and its corporate grandparent (the owner of the controlling stockholder), point out that only $1 million remains "outstanding" and that the target is ready to make that repayment and close. The Defendants (the acquirer and merger sub) point out that over $150 million of credit owed to the controlling stockholder *has been* outstanding, and was not repaid, but forgiven. This makes a difference in the purchase price, because the forgiveness increases book value and the buyer must pay the premium on such book value at closing.

The Plaintiffs seek a declaratory judgment of their rights under the merger agreement, and specific performance. The Defendants have counterclaimed, raising

1

contractual defenses including but not limited to the dispute just described, and invoking the implied covenant in the latter dispute as well. I bifurcated the matter and held a trial on two issues: Does the closing condition in the merger agreement described above exclude retiring debt by forgiveness? And if not, does the implied covenant serve to provide that term? I find the answer to both is in the negative, for the reasons below.

## I. BACKGROUND

This Action involves the purchase of RoundPoint Mortgage Servicing Corporation by Freedom Mortgage Corporation (the "Merger"). The Merger was agreed to via an agreement and plan of merger executed on May 23, 2019 (the "Merger Agreement").

The facts in this Memorandum Opinion reflect my findings based on the parties' briefing, 149 documentary exhibits, and trial held on June 17, 2020. This Memorandum Opinion resolves *only* the Plaintiffs' claim for a declaratory judgment under Section 7.02(f) of the Merger Agreement and the Defendants' third counterclaim alleging breach of the implied covenant of good faith and fair dealing. My findings herein are without prejudice to the resolution of the remaining claims to be heard at the second phase of trial.[1]

---

[1] Citations to the Joint Trial Exhibits are cited as "JX #". Citations to the Declarations submitted in this matter, which are included as JX 104, JX 105, JX 106, JX 107 and JX 108, are referenced

*A. The Parties*

Plaintiff and Counterclaim Defendant RoundPoint Mortgage Servicing Corporation ("RoundPoint") is a Delaware corporation engaged in the business of originating, refinancing, and servicing residential mortgage loans.[2] RoundPoint acquires Mortgage Servicing Rights ("MSRs") and originates, refinances, and services residential mortgage loans; MSRs are RoundPoint's primary assets.[3]

Plaintiff and Counterclaim Defendant RPFG Holdings, Inc. ("Holdings") is a Florida corporation.[4] Holdings owns 100% of the membership interests of non-party RoundPoint Financial Group, LLC ("RPFG").[5] RPFG itself owns approximately 79% of the voting power of RoundPoint and over 99% of RoundPoint's common stock.[6]

Defendant and Counterclaim Plaintiff Freedom Mortgage Corporation ("Freedom") is a New Jersey Corporation and one of the nation's largest mortgage loan originators and servicers, with approximately 8,000 employees and contractors in more than 75 locations in the United States.[7]

---

herein as "[Name] Decl.". I cite to the Plaintiffs' Verified Complaint ("Compl.") where the Plaintiffs' allegations are not in dispute.

[2] Compl., ¶ 15.
[3] Zeidman Decl., ¶ 3.
[4] Compl., ¶ 16.
[5] *Id*.; Zeidman Decl., ¶ 2.
[6] Compl., ¶ 16; Zeidman Decl., ¶ 2.
[7] King Decl., ¶ 1; Compl., ¶ 17.

Defendant and Counterclaim Plaintiff FMC/Radiant Merger Sub Inc. ("Merger Sub") is a Delaware corporation wholly owned by Freedom, and was incorporated for the purpose of effectuating the Merger.[8]

*B. The Merger Agreement and the RPFG Facility*

On May 23, 2019, RoundPoint, Holdings (for limited purposes), Freedom, and Merger Sub agreed to the Merger Agreement, which sets forth an acquisition of RoundPoint by Freedom.[9] The consideration to be paid in cash by Freedom was not fixed, but was to be calculated according to a book-value-based formula.[10] The consideration is determined by taking the book value—*i.e.* the net asset value—of RoundPoint as of the last day of the month immediately preceding the month in which closing occurs, multiplying that amount by 107.5%, and subtracting $4,150,000 from the product.[11] The practical implication of this formula is that the consideration to be paid by Freedom in the Merger was uncertain when the Merger Agreement was signed, and that any fluctuation will be attributable to changes in RoundPoint's net asset value.

Before entering into the Merger Agreement, RoundPoint had an existing revolving credit facility with Bank of America Merrill Lynch ("BAML," and the

---

[8] Compl., ¶ 18.
[9] JX 29 ("Merger Agreement").
[10] *Id.* § 2.01.
[11] *Id.* §§ 2.01, 10.02 ("Book Value of the Company").

revolving credit facility the "BAML Loan").[12] The BAML Loan is secured by RoundPoint's MSR assets.[13] MSRs fluctuate in value depending on a number of factors, namely, market interest rates.[14] The mechanics of the BAML Loan were such that RoundPoint was subject to margin calls if the value of the MSR collateral declined.[15] In negotiating the Merger Agreement, Freedom expressed a preference that the BAML Loan remain in place after the signing of the Merger Agreement.[16] RoundPoint was concerned that if the BAML Loan was subject to margin calls between signing and closing—because RoundPoint's MSRs declined in value— restrictions in the Merger Agreement, such as restrictions on selling assets, could restrain RoundPoint from taking steps it would ordinarily take to pay margin calls under the BAML Loan.[17]

The parties' solution to RoundPoint's concerns about meeting BAML's margin calls was to permit RoundPoint to borrow funds from RPFG—its controlling stockholder—pursuant to a revolving credit facility.[18] No such facility was in place before the parties entered into the Merger Agreement.[19] Though the facility was not entered into before the Merger Agreement was signed, it was provided for in the

---

[12] Zeidman Decl., ¶ 5; King Decl., ¶ 3; Reisman Decl., ¶ 7.
[13] Zeidman Decl., ¶ 5; Reisman Decl., ¶ 8.
[14] Reisman Decl., ¶ 8.
[15] *Id.*
[16] *Id.* ¶ 7; Mallol Decl., ¶ 5.
[17] Reisman Decl., ¶ 8.
[18] *Id.* ¶ 9.
[19] King Decl., ¶ 6.

Merger Agreement as the "RPFG Facility."[20] The Merger Agreement states that the RPFG Facility "means the Resolving Unsecured Loan Facility to be entered into between [RoundPoint], as borrower, and [RPFG], as Lender, substantially on terms as set forth on Schedule 5.01(b)(iv)."[21]

Schedule 5.01(b)(iv) contains a summary of principal terms and conditions for the RPFG Facility in the form of a term sheet.[22] The maximum borrowing amount in Schedule 5.01(b)(iv) is $40,000,000.[23] Schedule 5.01(b)(iv) states that the affirmative covenants and negative covenants of the RPFG Facility were to be "[u]sual and customary for transactions of this type."[24] The proceeds of the RPFG Facility may only be used to meet margin calls under the BAML Loan.[25]

Section 7.02 of the Merger Agreement states in pertinent part:

> The obligation of [Freedom] and [Merger Sub] to effect the Merger are further subject to the satisfaction or waiver on or before the Closing Date of each of the following conditions . . . (f) RPFG Facility. If the RPFG Facility has been put in place prior to Closing, [RoundPoint] shall have obtained any and all necessary consents to repay (in accordance with all of its contractual obligations and restrictions, and otherwise), *and shall have repaid, all amounts outstanding under the RPFG Facility.*[26]

---

[20] Reisman Decl., ¶ 9; Merger Agreement, § 10.02 ("RPFG Facility").
[21] Merger Agreement, § 10.02 ("RPFG Facility").
[22] JX 30, Schedule 5.01(b)(iv).
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] Merger Agreement, § 7.02 (emphasis added).

As noted, the parties executed the Merger Agreement on May 23, 2019.[27] RoundPoint faced a margin call shortly thereafter, and, consequently, on May 31, 2019 RoundPoint and RPFG entered into the RPFG Facility.[28]

*C. RPFG Purports to Forgive Amounts Under the RPFG Facility*

In June 2019, Freedom approved an increase of the RPFG Facility from $40 million to $100 million.[29] The increase was presumably necessary due to further declines in value of RoundPoint's MSRs, leading to margin calls under the BAML Loan. Freedom's approval was necessary to increase the amount of the RPFG Facility due to restrictions on RoundPoint's incurrence of indebtedness under Section 5.01(b)(iv) of the Merger Agreement.[30] Thereafter, in August 2019, Freedom approved a further increase of the RPFG Facility, and RoundPoint and RPFG increased the size of the RPFG Facility to $123 million in January 2020.[31]

After the RPFG Facility was increased to $123 million, RPFG forgave $50 million under the RPFG Facility in January 2020, taking the balance from $123 million to $73 million at the end of January 2020.[32] In February 2020, RoundPoint borrowed an additional $50 million under the RPFG Facility to satisfy and/or avoid

---

[27] Merger Agreement.
[28] JX 36; Reisman Decl., ¶ 15.
[29] Zeidman Decl., ¶ 7; JX 38, at RP_000082897.
[30] *See* Merger Agreement, § 5.01(b)(iv).
[31] JX 54, at RP_000085000; Zeidman Decl., ¶ 9; King Decl., ¶ 33(a).
[32] Reisman Decl., ¶ 23.

7

margin calls.[33] RPFG then forgave $122 million, leaving RoundPoint owing $1 million under the RPFG Facility at the end of February 2020.[34] Additional loans were extended in early March 2020, though the amounts are unclear from the record.[35] In February 2020, RoundPoint communicated that it was able to repay all amounts then outstanding under the RPFG Facility—that is, $1 million—and sought confirmation from Freedom that Freedom would close the transaction on March 16, 2020.[36] On March 2, 2020, Freedom refused to confirm that it would close the transaction, and contended that all conditions to closing had not been met.[37]

*D. Procedural History*

RoundPoint and Holdings filed their Verified Complaint (the "Complaint") on March 4, 2020. The Complaint seeks a declaratory judgment and specific performance of the Merger Agreement.[38] Specifically, the Complaint seeks a declaration that Section 7.02(f) of the Merger Agreement will be satisfied by forgiveness by RPFG and repayment by RoundPoint of any outstanding amount (after such forgiveness) under the RPFG Facility.[39] Freedom and Merger Sub filed their Answer and Verified Counterclaims on March 24, 2020.[40] The Defendants

---

[33] *Id.* ¶ 26.
[34] *Id.*
[35] *See Id.* ¶ 29.
[36] *Id.* ¶ 25.
[37] *Id.* ¶ 29; JX 90.
[38] Compl., ¶¶ 78–92.
[39] *Id.* ¶¶ 78–84.
[40] Defs.' Answ. and Verified Countercls., D.I. 28 ("Answ. and Countercls.").

made three counterclaims: the first for a declaratory judgment that they have no obligation to close the Merger, the second for breach of contract, and the third for breach of the implied covenant of good faith and fair dealing.[41]

The parties sought to commence motion practice, and I agreed to hear the Plaintiffs' motion for partial summary judgment—on their declaratory judgment claim regarding Section 7.02(f)—and the Plaintiffs' motion to dismiss the Defendants' implied covenant counterclaim. I heard Oral Argument on these motions on April 22, 2020. At the conclusion of Oral Argument, I denied the Plaintiffs' motion to dismiss the implied covenant counterclaim.[42] I subsequently ruled that ambiguities exist in Section 7.02(f) of the Merger Agreement, and denied the Plaintiffs' motion for partial summary judgment on their declaratory judgment claim.[43] I then instructed the parties to engage in discovery and presentation regarding only those issues which I had considered at Oral Argument—that is, the declaratory judgment claim under Section 7.02(f) of the Merger Agreement and the Defendants' implied covenant counterclaim.[44] I held a one day trial on June 17, 2020 regarding those claims and considered the matter submitted for decision on that date.

---

[41] *Id.* ¶¶ 89–108.
[42] Oral Arg. Tr., D.I. 80, at 65:15–65:20.
[43] Oral. Arg. Tr., D.I. 81, at 6:20–7:2.
[44] Letter, D.I. 59.

## II. ANALYSIS

*A. Section 7.02(f)*

The Plaintiffs ask for a declaratory judgment that Section 7.02(f) of the Merger Agreement will be satisfied by repayment by RoundPoint of any amount outstanding (after giving effect to forgiveness by RPFG) under the RPFG Facility.[45] Section 7.02(f) is replicated in full, *supra*, but the parties' dispute on the Plaintiffs' claim ultimately boils down to eleven words: "and shall have repaid, all amounts outstanding under the RPFG Facility."[46] The Plaintiffs contend that to fulfill the closing condition RoundPoint must repay, at or prior to closing, all outstanding amounts then owed to RPFG, *i.e.* leaving no balance owed, and that Section 7.02(f) does not prohibit forgiveness of debt under the RPFG Facility. Conversely, the Defendants argue that RoundPoint and Freedom intended Section 7.02(f) to require repayment in full of *all* amounts borrowed under the RPFG Facility and outstanding *at any time*, and not to permit such loans to be forgiven by RPFG.

The Plaintiffs previously moved for summary judgment on their declaratory judgment claim.[47] Summary judgment on a contract claim is appropriate only if the language is clear and unambiguous.[48] I denied the Plaintiffs' motion for partial

---

[45] Compl., ¶ 84.
[46] Merger Agreement, § 7.02(f).
[47] Pls.' Mot. for Partial Summ. J., D.I. 35.
[48] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

summary judgment because I found Section 7.02(f) to be ambiguous.[49] "Contracts are ambiguous 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"[50] At the summary judgment stage I found both the Plaintiffs' and the Defendants' interpretation of Section 7.02(f) reasonable.

Though both interpretations are reasonable, the Plaintiffs' interpretation of Section 7.02(f) is certainly the more intuitive reading. Delaware law mandates that "when interpreting a contract, the role of a court is to effectuate the parties' intent. In doing so, we are constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended."[51] The combination of words used in the relevant clause of Section 7.02(f), considering their plain meaning, does not explicitly comment on or restrict in any way amounts no longer "outstanding." Accordingly, in the Plaintiffs' view of this language, RoundPoint must have repaid only the "outstanding" balance of its loans to fulfill the closing condition, not some other amount, be it the full, original amount of the loans, or some amount outstanding at some other point in time. Forgiven debt *is no longer outstanding*.[52] The words "shall have repaid," per the Plaintiffs, are applicable *only*

---

[49] Oral. Arg. Tr., D.I. 81, at 6:20–7:2.
[50] *United Rentals*, 937 A.2d at 830 (quoting *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).
[51] *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008).
[52] *Forgive*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/forgive ("to grant relief from payment of").

11

to the amounts outstanding immediately prior to closing, and do not operate on any amounts no longer outstanding, without regard to *why* such amounts are no longer outstanding. The intent expressed through such a reading of Section 7.02(f) is simply that no amounts may remain outstanding on the RPFG Facility in order for the Plaintiffs to fulfill the closing condition. If the outstanding amount is $0, RoundPoint is in compliance.

The Defendants' reading, by contrast, has a temporal element, that is, that "shall have repaid" (rather than "shall repay") refers not only to any amounts outstanding immediately prior to closing, but to *any* amounts that were *ever* outstanding under the RPFG Facility. But to accept the Defendants' reading would be to read the clause as containing a cryptic protection against the retirement of debt under the RPFG Facility by any means other than repayment. The plain language of the section is not naturally read this way because, as noted, the language is silent on how amounts are to be deemed "outstanding." If the intent was to ensure that debt be repaid and *not* forgiven, that intent is expressed poorly. Though I have found the Defendants' proffered interpretation not unreasonable for purposes of summary judgement, it is certainly the less intuitive reading.

Where, such as here, the contract is ambiguous, the court may consider extrinsic evidence to resolve the ambiguity.[53] The court "will apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract."[54] Such extrinsic evidence can include overt statements and acts of the contracting parties, the business context, prior dealings between the parties, and business custom and usage in the industry.[55] "After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of the negotiation."[56]

The parties have submitted extrinsic evidence, but it does not aid my understanding as to whether the parties intended Section 7.02(f) to restrict forgiveness of RPFG Facility debt. Remarkably, the parties agree that forgiveness of RPFG Facility debt was *never discussed* during the negotiations of the Merger Agreement.[57] Though the parties disputed whether RPFG could forgive RPFG Facility debt *after* the Merger Agreement was signed, one of the "primary tenets" of

---

[53] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) (citing *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 55 (Del. Ch. 2001)).

[54] *Id*. (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013)).

[55] *Id*. (quoting *Mobilactive*, 2013 WL 297950, at *15).

[56] *Id*. (quoting *Mobilactive*, 2013 WL 297950, at *15).

[57] Defs.' Corrected Pretrial Br., D.I. 90, at 40 ("[F]orgiveness of the RPFG Facility debt was never discussed **at all** during the negotiations." (emphasis in original)); Pls.' Answering Pre-Trial Br., D.I. 95, at 16 ("Freedom also relies heavily upon the fact that forgiveness of the RPFG Facility was not explicitly discussed before execution of the Merger Agreement. The parties agree on that point." (footnotes omitted)).

the parol evidence rule is that "relevant extrinsic evidence is that which reveals the parties' intent *at the time they entered into the contract*. In this respect, backward-looking evidence gathered after the time of contracting is not usually helpful."[58] Consequently, though the parties dutifully collected and presented extrinsic evidence for trial, there is no evidence extrinsic to the Merger Agreement read as a whole pertinent to whether the parties intended to regulate or restrict RPFG Facility debt forgiveness in Section 7.02(f). The Defendants point to the fact that the peculiar consideration here—book value plus a premium—will allow the Plaintiffs to reap a windfall by retiring the RPFG Facility debt by forgiveness, but fail to point to any evidence that the parties recognized this and intended to avoid it through the language of Section 7.02(f).

Though the extrinsic evidence does not help resolve Section 7.02(f)'s ambiguity, other provisions of the Merger Agreement regarding forgiveness of debt are probative, and fatal to the Defendants' proffered interpretation of the provision. Section 3.21(d) of the Merger Agreement is a representation and warranty of RoundPoint regarding mortgage loans that "[n]o payment of principal or interest on the mortgage loan has been *forgiven*, suspended, or rescheduled."[59] Section

---

[58] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 n.11 (Del. 1997), (citing *Demetree v. Commonwealth Tr. Co.*, 1996 WL 494910 (Del. Ch. Aug. 27, 1996)) (emphasis in original).

[59] Merger Agreement, § 3.21(d) (emphasis added).

14

3.06(b)(vi) of the Merger Agreement is a representation and warranty that none of RoundPoint or its subsidiaries has "*cancelled, compromised, waived or released* any right or claim or any Indebtedness owed to it, in any instance involving more than $100,000."[60] Clearly, where the parties sought to impose restrictions on the forgiveness or modification of RoundPoint's debt obligations they knew how to do so.[61] Consequently, because Section 7.02(f), as most naturally read, does *not* impose a restriction on debt forgiveness, and because the Merger Agreement shows that where the parties sought to impose such restrictions they knew how to do so, I find that the parties *did not* intend Section 7.02(f) to prohibit forgiveness of debt under the RPFG Facility.[62]

Before moving onto the Defendants' implied covenant claim, it is important to note that my construction of Section 7.02(f) of the Merger Agreement is limited

---

[60] *Id*. § 3.06(b)(vi) (emphasis added).

[61] *See Roseton OL, LLC v. Dynegy Hldgs. Inc.*, 2011 WL 3275965, at *10 (Del. Ch. July 29, 2011) ("This demonstrates that when the parties intended to make a particular restriction applicable to both DHI and its subsidiaries, they knew how to do so and readily could accomplish that objective."); *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *11 (Del. Ch. Nov. 30, 2017) ("There, the parties placed a modifier ('as of the Closing') next to a verb ('will assume') to define when that action would occur, demonstrating that they knew how to place a temporal modifier on an action when they wished to do so."); *El Paso Nat. Gas Co. v. Amoco Prod. Co.*, 1992 WL 43925, at *7 (Del. Ch. Mar. 4, 1992) ("Clearly, when the negotiators meant to address most-favored-rates protection, they knew how to do so directly.").

[62] I note that the record reflects that the Merger Agreement was negotiated heavily by sophisticated entities with the assistance of counsel, and consequently the doctrine of *contra proferentem* has no application here. *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 2014 WL 2919333, at *26 n.192 (Del. Ch. June 25, 2014), *aff'd*, 116 A.3d 1244 (Del. 2015) ("As an initial matter, I do not consider it appropriate to apply the doctrine of *contra proferentem* to this dispute because the License Agreement and the consent both were negotiated heavily by sophisticated entities with the assistance of counsel.").

to that clause only.  While I have found that Section 7.02(f) does not prohibit forgiveness of RPFG Facility debt, this *does not mean* that such a restriction cannot be found elsewhere in the Merger Agreement, *outside* Section 7.02(f); that issue remains.[63]  Nor does it mean that all conditions to closing the Merger have been met. I have read and considered the contract as a whole as it bears on the language in question.  Because this matter was bifurcated,[64] however, I have not considered here (nor have the parties yet litigated) whether the Merger Agreement *as a whole* permits RoundPoint to meet all conditions to closing considering RPFG's forgiveness of debt under the RPFG Facility.  All I can say at this point is that the obligation expressed in the language of Section 7.02(f) itself will be fulfilled if RoundPoint repays any amount outstanding under the RPFG Facility, thus bringing indebtedness under the RPFG Facility to $0.

*B. The Implied Covenant Counterclaim*

The Defendants have counterclaimed that implicit in RoundPoint's obligation to repay all amounts outstanding under the RPFG Facility pursuant to Section 7.02(f) is the covenant of good faith and fair dealing not to engage in what the Defendants term the "debt forgiveness scheme."[65]  The covenant of good faith and fair dealing

---

[63] For example, the Defendants assert that the Plaintiffs have used forgiveness, then reborrowing, to borrow in the aggregate in excess of the contractual debt limits on the RPFG Facility.  I do not address that issue here.

[64] I bifurcated the matter in the belief that efficiency would result; sadly, that belief has proved deluded.

[65] Answ. and Countercls., ¶ 102.

inheres in all contracts, but the doctrine does not provide a court with the authority to "rewrite or supply omitted provisions to a written contract."[66] The implied covenant is "used to infer contract terms to handle developments of contractual gaps that the asserting party pleads neither party anticipated," and applies "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting."[67]

To prevail on their implied covenant claim, the Defendants must prove "a specific implied contractual obligation, a breach of that obligation by the [Plaintiffs], and resulting damage to the [Defendants]."[68] The Defendants must show "from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter."[69]

The implied covenant will imply "only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."[70]

---

[66] *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

[67] *Buckeye Partners, L.P. v. GT USA Wilmington, LLC*, 2020 WL 2551916, at *7 (Del. Ch. May 20, 2020) (quoting *Dieckman v. Regency GP*, 155 A.3d 358, 367 (Del. 2017)).

[68] *Id*. at *8 (quoting *Fitzgerald*, 1998 WL 842316, at *1).

[69] *Id*. (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)) (internal alterations omitted).

[70] *Id*. (quoting *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013)).

Thus, the Defendants must show it is clear that the parties would have agreed to prohibit forgiveness of RPFG Facility debt.[71] That is, that the parties *would not* have agreed to some other contract term. The Defendants have the burden to show that RPFG's debt forgiveness constituted a breach of the implied covenant.[72] It is vital to the freedom of contract that the implied covenant be so limited. The value of contracts is based on certainty and enforceability. The promiscuous employment of equity to amend contracts to make them "fair" or "reasonable" would be fatal to those qualities.

The Plaintiffs concede that some unfairness results from the forgiveness of RPFG Facility debt under the Merger Agreement. That is because the purchase price is calculated by taking the book value of RoundPoint and multiplying it by 107.5% (and subtracting a fixed amount from the product). RPFG is both RoundPoint's controlling stockholder and is owed the RPFG Facility debt obligation. Where debt is forgiven by RPFG it increases the book value—*i.e.* net asset value—of RoundPoint. Every dollar of debt that RoundPoint is no longer obligated to repay increases the book value of RoundPoint by one dollar. If RoundPoint was to use a dollar of assets to extinguish the debt, the impact on book value is neutral—a dollar

---

[71] *See Katz*, 508 A.2d at 880.

[72] *See Caldera Properties-Lewes/Rehoboth VII, LLC v. Ridings Dev., LLC*, 2009 WL 2231716, at *29 (Del. Super. May 29, 2009), *aff'd sub nom. Ridings Dev., LLC v. Caldera Properties - Lewes/Rehoboth VII, LLC*, 998 A.2d 851 (Del. 2010).

18

of debt disappears but so does a dollar of assets. But where *only* a dollar of debt disappears due to forgiveness, book value rises by a dollar because there is no offsetting drop in assets. Thus, RoundPoint's controlling stockholder (RPFG) benefits (almost) 7.5 cents per dollar of debt it forgives.[73] Further, although Freedom upon closing would receive an additional dollar of assets for every dollar that is forgiven—because that dollar need not be used to extinguish RPFG Facility debt—each such dollar requires Freedom to come up with an additional dollar (plus premium) in cash at closing in order to meet its obligation to close, which is not a neutral result. But these facts, to my mind, do not imply that the parties therefore clearly would have provided a "no forgiveness" term; it only suggests that the parties, had they considered the issue, would likely have addressed it in some form. One plausible and less restrictive way to address the issue, for instance, would simply have been to agree to excuse the Defendants from payment of the 7.5% premium on amounts forgiven.

The Plaintiffs dispute that they would have agreed to an outright prohibition on RPFG forgiving RPFG Facility debt, had the matter been considered. Consistent with the problematic outcome described above, the Plaintiffs suggest that RoundPoint may have agreed to forgo the premium on forgiven amounts—this, I

---

[73] As noted, *supra*, RPFG owns approximately 79% of the voting power of RoundPoint and over 99% of RoundPoint's common stock.

19

note, they have offered to do in this litigation.[74]  The Defendants, unsurprisingly, argue otherwise.  The Defendants specifically cite the Merger Agreement's restrictions on indebtedness, and certain terms of the RPFG Facility term sheet in the Merger Agreement.  These are not helpful, I find, to demonstrate that the parties clearly would have prohibited forgiveness of RPFG Facility debt.  As the parties *did not even* discuss such forgiveness, it is unsurprising that no useful evidence exists in this regard.  Nonetheless, one can posit conceivable business reasons (other than a bad-faith "forgiveness scheme") for RoundPoint to have preferred flexibility in this regard.  RoundPoint's Chairman did state under oath: "I believe Tavistock [RoundPoint's ultimate parent] would have refused [a prohibition on RPFG Facility forgiveness]."[75]

"The implied covenant is well-suited to imply contractual terms that are so obvious that the drafter would not have needed to include the conditions as express terms in the agreement."[76]  But it is not obvious what terms the parties would have agreed to regarding forgiveness of RPFG Facility debt, and no evidence exists from which to conclude that RoundPoint clearly would have agreed on an outright

---

[74] Pls.' Answering Pre-Trial Br., D.I. 95, at 33–34 ("[I]f RoundPoint were in fact seeking to collect the premium on forgiven amounts, it would be because it is a function of the variable purchase price formula to which Freedom willingly agreed.  But RoundPoint could not be clearer that it *is not seeking it*." (italics in original)).

[75] Reisman Decl., ¶ 12.

[76] *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2019 WL 4927053, at *22 (Del. Ch. Oct. 7, 2019) (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 361 (Del. 2017)) (internal alterations and ellipses omitted).

20

prohibition on forgiveness. A prohibition on forgiveness would have obligated RoundPoint to repay all amounts borrowed from RPFG under the RPFG Facility. I note that the very reason for the creation of the RPFG Facility—restrictions on RoundPoint's ability to sell assets to meet margin calls—suggests that RoundPoint would have been likewise restricted from selling assets to retire RPFG Facility debt. But there is nothing in the record to suggest how a prohibition on forgiveness would have otherwise required a deviation from RoundPoint's business practices before the Merger Agreement, and thus no suggestion of how amenable RoundPoint would have been to a prohibition of RPFG Facility debt forgiveness.

In order to employ the implied covenant to impose an unwritten term in a contract, I must find that the parties, had they engaged on the issue, would clearly have imposed that term.[77] I have no doubt that the Defendants would have been willing to agree to modifications of the Merger Agreement to address the issue,

---

[77] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). It is the burden of a party who invokes the implied covenant to show that "it is *clear* from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter." *Gerber v. Enter. Prod. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013) (quoting *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440 (Del. Ch. 2012) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986))) (emphasis added); *but see Murfey v. WHC Ventures, LLC*, 2020 WL 3957837, at *8 (Del. July 13, 2020) (citing *Schwartzberg v. CRITEF Assocs. Ltd. P'ship*, 685 A.2d 365, 376 (Del. Ch. 1996)) ("[U]nder Delaware law, an obligation may be inferred from a contract when, given the terms of the express contract made and the circumstance of the contracting process, it is more likely than not, that if the parties had thought to address the subject, they would have agreed to create the obligation that is under consideration by the court *ex post facto*.").

including prohibiting forgiveness of RPFG Facility debt, *because that was in their interest* considering the premium on forgiven amounts. But that is not the inquiry. To grant relief on the implied covenant claim I would need to conclude it is clear that *RoundPoint* would have likewise agreed to such a term—the Defendants have not met their burden to show that RoundPoint and Freedom "would have agreed to proscribe [forgiveness] had they thought to negotiate with respect to that matter."[78] Consequently, the Defendants' implied covenant claim must fail.

### III. CONCLUSION

The Plaintiffs are entitled to a declaratory judgment on the limited issues before me. The Defendants are not entitled to relief on their implied covenant counterclaim. This matter should proceed to the second phase of trial.

---

[78] *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 184 (Del. Ch. 2014) (quoting *Gerber*, 67 A.3d at 418).