# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PETER SERVAAS, ILYA REKHTER, JUSTIN REES, and KELLY REES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0909-LWW |
| FORD SMART MOBILITY LLC and JOURNEY HOLDING CORP., d/b/a TRANSLOC INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: June 3, 2021
Date Decided: August 25, 2021

Michael A. Barlow, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Renita Sharma, Ty Adams, and Charles Sangree, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Plaintiffs Peter SerVaas, Justin Rees, and Kelly Rees*

Michael A. Barlow, ABRAMS & BAYLISS LLP, Wilmington, Delaware; George Gasper, ICE MILLER LLP, Indianapolis, Indiana; *Counsel for Plaintiff Ilya Rekhter*

Raymond J. DiCamillo and John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Katherine V.A. Smith, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California; Jason J. Mendro, Molly T. Senger, Matt Gregory, Brittany A. Raia, and Rebecca Rubin, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C.; *Counsel for Defendants Ford Smart Mobility LLC and Journey Holding Corp.*

**WILL, Vice Chancellor**

In July 2019, the plaintiffs—the founders and original owners of two start-ups—sold their companies to defendant Ford Smart Mobility LLC. The parties entered into various agreements in connection with that sale, including agreements addressing the plaintiffs' employment, transaction bonuses, and deferred consideration. In June 2020, the plaintiffs were terminated (purportedly) for cause one month before certain payments to them were scheduled to vest.

The plaintiffs claim that those terminations were improper and assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of the Delaware Wage Payment and Collection Act. The defendants have moved to dismiss the majority of those claims. This decision holds that the plaintiffs have failed to state a claim for relief as to the breach of contract claim that the defendants challenge, the unjust enrichment claim, and the claim for violation of the Delaware Wage Payment and Collection Act. The plaintiffs have, however, stated a viable claim at the pleadings stage for breach of the implied covenant of good faith and fair dealing. The defendants' partial motion to dismiss is granted in part and denied in part.

## I.  FACTUAL BACKGROUND

The following facts are drawn from the Verified Complaint and the documents it incorporates by reference.[1]

### A.  Ford Buys Journey

Plaintiffs Peter SerVaas and Ilya Rekhter co-founded DoubleMap, Inc. during college in 2010.[2]  Plaintiffs Justin Rees and Kelly Rees (together with SerVaas and Rekhter, the "Founders" and each a "Founder") co-founded Ride Systems LLC while attending college in 2004.[3]  DoubleMap and Ride Systems sought to "provide intelligent transportation solutions for municipal transit fleets, university systems, corporations, hospitals, and airports."[4]

The Founders formed defendant Journey Holding Corp. in October 2018 for the purposes of owning and operating DoubleMap and Ride Systems.[5]  In January 2019, DoubleMap and Ride Systems were merged under the Journey umbrella.[6]

---

[1] Verified Compl. ("Compl.") (Dkt. 1). *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms."); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . ."), *aff'd*, 58 A.3d 414 (Del. 2013).

[2] Compl. ¶¶ 12, 19.

[3] *Id.* ¶ 20.

[4] *Id.* ¶¶ 11–12, 19.

[5] *Id.* ¶ 10.

[6] *Id.*

Several companies, including defendant Ford Smart Mobility LLC ("Ford"), a wholly owned subsidiary of Ford Motor Company that "design[s], build[s], grow[s], and invest[s] in emerging mobility services,"[7] subsequently expressed interest in acquiring Journey.[8]

On July 25, 2019, Ford agreed to purchase Journey from the Founders—who were Journey's sole stockholders at the time—for approximately $40 million in immediate and deferred consideration.[9] The Founders, Ford, and Journey entered into a series of contracts to govern that acquisition and the Founders' employment arrangements and compensation post-closing.

### 1. The Stock Purchase Agreement and Transaction Bonuses

The agreement effectuating the sale of Journey to Ford is the Stock Purchase Agreement (the "SPA"). In addition to the purchase price of approximately $40 million, Section 7.14 of the SPA required Ford and Journey create an "Employee Incentive Bonus Plan" of up to $5 million:[10]

> Following the Closing, [Ford] shall, or shall cause [Journey] to, either adopt a plan or enter into agreements that provide for grants of possible cash performance incentives in the aggregate amount of $5 million to employees of the Company allocated as set forth on Schedule 7.14 and

---

[7] *Id.* ¶ 9.

[8] *See id.* ¶¶ 10, 25–26.

[9] *Id.* ¶ 2.

[10] Compl. Ex. B (Stock Purchase Agreement) § 7.14.

subject to vesting based on the achievement of performance metrics as summarized on <u>Schedule 7.14</u>.[11]

Section 7.14 also provides that "nothing in this Section 7.14 shall create any rights in any employees of the Company or any other Person not a party to this Agreement."[12]

Schedule 7.14 to the SPA details the revenue "performance metrics" necessary to trigger these "transaction bonuses" and spells out the "Potential Bonus Amounts" that each Founder and other specified Journey employees could receive.[13] Schedule 7.14 provides that 50% or $2.5 million of the bonus pool would be payable by March 15, 2020 if Journey met certain revenue growth targets for fiscal year 2019.[14] The remaining $2.5 million would be payable by March 15, 2021 if Journey met further revenue growth targets for fiscal year 2020.[15]

Through an agreement titled Founder Consent to Transaction Bonus Plan Reallocation (the "Reallocation Agreement") dated March 10, 2020, SerVaas, Kelly Rees, and Rekhter agreed to an adjustment to their "Potential Bonus Amounts" in

---

[11] *Id.*

[12] *Id.*

[13] *See* Compl. Ex. C (Disclosure Schedule 7.14 to the Stock Purchase Agreement).

[14] *See id.*

[15] *See id.*

Schedule 7.14.[16]  This adjustment allowed for each Founder to receive potential "transaction bonuses":[17]

| Founder | March 2020 Bonus Amount | March 2021 Bonus Amount | Total |
|---|---|---|---|
| Ilya Rekhter | $500,000 | $100,000 | $600,000 |
| Peter SerVaas | $495,000 | $495,000 | $990,000 |
| Kelly Rees | $120,000 | $120,000 | $240,000 |
| Justin Rees | $500,000 | $500,000 | $1,000,000 |

Recital B to the Reallocation Agreement states that each Founder can only receive a transaction bonus if Journey meets the performance targets *and* he or she is employed at Journey on the payment date:

> Certain employees of [Journey] have been designated to participate in the Bonus Pool with the potential to receive two cash Transaction Bonus payments if the performance targets are attained, *and the employee is still employed with the Company on each payment date*, in accordance with the terms of the transaction bonus agreements to be executed in connection with the Transaction Bonus (the "Transaction Bonus Agreements").[18]

Journey and each Founder also entered into "Transaction Bonus Agreements" dated March 5, 2020.[19]  A recital in the Transaction Bonus Agreements explains that bonus payments are available if certain performance targets are attained and the Founder "*is still employed with the Company Group on each payment date*, in

---

[16] Compl. Ex. D (Founder Consent to Transaction Bonus Reallocation).

[17] Compl. Ex. D at Ex. A.

[18] Compl. Ex. D (emphasis added).

[19] *See* O'Toole Decl. Ex. 1 (Transaction Bonus Agreements) (Dkt. 12).

accordance with the terms described" in the agreement.[20]  Section 3 of the Transaction Bonus Agreements similarly provides that each Founder's "potential Transaction Bonus amount" will be paid "provided that the performance targets set forth below are attained, and *Employee is continuously employed with the Company Group through and including the applicable payment dates*."[21]

### 2.    The Deferred Consideration Agreements

Each Founder also entered into a Founder Deferred Consideration Agreement (the "DCAs") with Ford and Journey in connection with the acquisition.  The Founders agreed to defer approximately 30% of the $40 million purchase price through the DCAs and receive distributions of the remaining consideration over the following two years.[22]  The DCAs provide that the deferred consideration "will vest in installments" based on the achievement of certain time-based and performance-based targets.[23]

The DCAs detail what will happen to unvested deferred consideration if a Founder is terminated.  Section 4.a of the DCAs provides for immediate vesting of any unvested amount if a Founder is terminated "without Cause" or resigns for

---

[20] *Id.* at 1 (emphasis added).

[21] *Id.* § 3 (emphasis added).

[22] Compl. ¶ 28.

[23] *See* Compl. Ex. A (Founder Deferred Consideration Agreements) § 3.a.

"Good Reason."[24]   In that case, "any portion of the Time-Based portion of the Aggregate Founder Deferred Consideration Amount that is unvested immediately prior to Founder's employment termination date will vest effective as of the date of his or her employment termination."[25]   Alternatively, Section 4.e states that if a Founder is terminated for "Cause" or resigns "without Good Reason," the "Founder will forfeit any portion of the Aggregate Founder Deferred Consideration Amount that has not vested as of the date of his or her employment termination."[26]

The DCAs define what constitutes "Cause" for termination.  Relevant here, "Cause":

> [M]eans the occurrence of any of the following: . . . (iii) Founder's commission of an act of fraud, theft, embezzlement, misappropriation, self-dealing, or breach of fiduciary duty against the Company or any of its Affiliates, including, but not limited to, the offer, payment, solicitation or acceptance of any unlawful bribe or kickback with respect to the Company's business; . . . and (v) Founder's misconduct that constitutes a violation of a material written policy or rule of the Company or any of its Affiliates that is applicable to Founder and has been provided to Founder prior to such misconduct, as may be in effect from time to time during Founder's employment with the Company and its Affiliates, after there has been delivered to Founder a written notification from Parent that describes such violation and provides Founder with the ability to immediately take satisfactory corrective action, if corrective action is possible.[27]

---

[24] *Id.* § 4.a.

[25] *Id.*

[26] *Id.* § 4.e.

[27] *Id.* at 2.

7

**B.    The Founders Are Terminated from Employment at Journey.**

The Founders continued as employees of Journey after the acquisition pursuant to Executive Employment Agreements.[28]    Rekhter became the Vice President of Growth and later the Special Projects Lead.[29]   SerVaas became the Vice President of Innovation and was appointed to Journey's board of directors.[30]  Kelly Rees became the Vice President of Integration.[31]   Justin Rees became the Chief Executive Officer.[32]

In fiscal year 2019, Journey exceeded the revenue goal set forth in Schedule 7.14 to the SPA, the Transaction Bonus Agreements, and the Reallocation Agreement.[33]  Journey timely paid the 2020 bonus amounts to the Founders.[34]

On June 23, 2020—one month before the first portion of the Founders' deferred consideration under the DCAs was scheduled to vest—Ford terminated each Founder for cause through video conference calls.[35]  During these calls, Ford

---

[28] Compl. ¶ 31; *see* Compl. Ex. E (Executive Employment Agreements).

[29] *Id.* ¶ 32.

[30] *Id.* ¶ 33.

[31] *Id.* ¶ 34.

[32] *Id.*

[33] *Id.* ¶ 35.

[34] *See id.*  Although not mentioned in the Complaint, the plaintiffs represent in their answering brief that "Journey timely paid the 2020 Bonuses" and do not challenge or otherwise seek to recover damages related to this element of the agreements.  *See* Pls.' Answering Br. 29 (Dkt. 24).

[35] Compl. ¶ 36.

cited "fraud," "misappropriation of company resources," and "breach of fiduciary duties" as reasons for the terminations.[36] Ford also told each Founder that "everything has been investigated, corroborated, and verified, and we are not going to get into the details."[37]

On July 29, 2020, counsel for Ford sent counsel for the Founders a letter describing the purported grounds for terminating each Founder for cause.[38] Ford contended that Justin and Kelly Rees had improperly placed their nanny on the Ride Systems payroll and had attempted to secure employment or seek promotions for "unqualified friends and family."[39] Ford claimed that SerVaas had used Journey funds to pay a personal assistant, made false and misleading statements about "DoubleMap's products capabilities," and "engag[ed] in unethical business practices."[40] Ford asserted that Rekhter had made false representations about DoubleMap's and Journey's product capabilities and misrepresented himself as the CEO of Journey.[41]

---

[36] *Id.* ¶ 37.

[37] *Id.*

[38] *Id.* ¶ 51.

[39] *Id.* ¶ 53.

[40] *Id.* ¶ 82 (brackets in original).

[41] *Id.* ¶¶ 98, 105.

## C.     The Plaintiffs Bring this Action.

The plaintiffs filed this action on October 22, 2020, alleging that they were wrongfully terminated for cause and are entitled to approximately $12 million in forfeited deferred consideration for the sale of their stock to Ford and potential bonuses.  The Complaint advances six counts:  breach of the DCAs in Counts I and II; breach of the SPA and the Reallocation Agreement in Count III; breach of the implied covenant of good faith and fair dealing in Count IV; unjust enrichment in Count VI;[42] and violation of the Delaware Wage Payment and Collection Act (the "Wage Act")[43] in Count VII.

The defendants moved to dismiss Counts III through VII but did not seek dismissal of Counts I and II.[44]

## II.     LEGAL ANALYSIS

The defendants have moved to dismiss Counts III through VII pursuant to Court of Chancery Rule 12(b)(6) for failing to state a claim on which relief can be granted.  When considering such a motion:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate

---

[42] The Complaint does not include a Count V.

[43] 19 *Del. C.* § 1103.

[44] Dkt. 9; *see* Defs.' Opening Br. 2 n.1 (Dkt. 10).

unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.[45]

"[T]he pleading standards for purposes of a Rule 12(b)(6) motion 'are minimal,'" and the operative test is "one of 'reasonable conceivability,'" which "asks whether there is a 'possibility' of recovery."[46]

As the parties do in their briefs, I will address the plaintiffs' Wage Act claim before turning to their claims for breach of contract, breach of the implied covenant, and unjust enrichment. For the reasons that follow, I find that Count VII fails to state a claim on which relief can be granted because the plaintiffs cannot avail themselves of the Wage Act. I also find that Count III fails based on the plain language of the SPA and Reallocation Agreement and that Count VI fails to state a viable unjust enrichment claim because it is duplicative of the plaintiffs' contract-based claims. Count IV, for breach of the implied covenant of good faith and fair dealing, narrowly survives at this stage in the proceeding.

## A.     Claim for Violation of the Wage Act

The plaintiffs contend that Ford and Journey violated Delaware's Wage Act through their "unreasonable and illegal failure to pay the Founders' owed wages"

---

[45] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotation marks omitted).

[46] *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23–24 (Del. Ch. May 21, 2013) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011)).

under the DCAs, the SPA, and the Reallocation Agreement.[47]  The core issue is whether the plaintiffs can be considered "employees" for purposes of the statute.[48] Section 1101(a)(3) limits the applicability of the Wage Act to "any person suffered or permitted to work by an employer under a contract of employment either made in Delaware or to be performed wholly or partly therein."[49]  I conclude that the plaintiffs were not "employees" under that definition and, therefore, they cannot invoke the Wage Act.

The plaintiffs do not contend (nor could they) that any of the contracts relevant to this action were "made in Delaware."[50]  None of the plaintiffs physically worked in Delaware during their employment.  Justin Rees and Kelly Rees reside in Morgan, Utah[51] (where they lived while they were Journey employees) and their employment agreements provide that their "principal work location[s] w[ould] be at the Company's office in Utah."[52]  SerVaas and Rekhter reside in Indianapolis, Indiana[53]

---

[47] Compl. ¶ 186.

[48] "[T]he elements for a claim under 19 *Del. C.* § 1103 are:  1) plaintiff was an employee of the employer, 2) under a contract made in Delaware or to be performed in Delaware, 3) whose wages were withheld, and 4) there were no reasonable grounds to withhold the wages." *Nikolouzakis v. Exinda Corp.*, 2012 WL 3239853, at *12 (D. Del. Aug. 7, 2012).

[49] 19 *Del. C.* § 1101(a)(3).

[50] *Id.*

[51] Compl. ¶¶ 7–8.

[52] Compl. Ex. E (Executive Employment Agreement of Justin Rees) § 3; Compl. Ex. E (Executive Employment Agreement of Kelly Rees) § 3.

[53] Compl. ¶¶ 5–6.

12

(where they lived while they were Journey employees) and their employment agreements provide that their "principal work location[s] w[ould] be at the Company's office in Indiana."[54]  The Complaint does not allege that any Founder ever traveled to Delaware for work or any other purpose.

In *Klig v. Deloitte LLP*, the court held that a partner at Deloitte could not avail himself of the Wage Act because he "did not work wholly or partly within Delaware," but "instead worked out of Deloitte's New York office."[55]  The court explained that "Delaware can readily regulate within its borders, but cannot regulate the wages of an individual working in another state, outside of Delaware's jurisdiction."[56]  Other courts are in accord.[57]

---

[54] Compl. Ex. E (Executive Employment Agreement of Peter SerVaas) § 3; Compl. Ex. E (Executive Employment Agreement of Ilya Rekhter) § 3.

[55] *Klig v. Deloitte LLP*, 36 A.3d 785, 797 (Del. Ch. 2011).

[56] *Id.* at 798.

[57] *See Blood v. Columbus, US, Inc.*, 2017 WL 3432773, at *2 (Del. Super. Ct. Aug. 10, 2017) ("It is undisputed that Blood worked in Maryland, not Delaware. It is also undisputed that the Contract was not to be performed, even in part, in Delaware. The Court finds that under the plain language of Section 1101(a)(3), the Delaware Wage Payment and Collection Act does not apply to the contract in this case."); *see also Redick v. E Mortg. Mgmt., LLC*, 2013 WL 1089710, at *11 n.9 (D. Del. Mar. 15, 2013) ("It is also worth noting that other states, including Delaware, have interpreted their respective wage laws to extend only to regulation of employment within state borders."), *report and recommendation adopted,* 2013 WL 5461616 (D. Del. Sept. 30, 2013); *Priyanto v. M/S AMSTERDAM*, 2009 WL 175739, at *7 (C.D. Cal. Jan. 23, 2009) ("This court has found no decision applying any state's wage laws to nonresidents who did not work in the state, regardless of the other contacts. Courts interpreting other states' wage laws have, like the IASCO court, focused on the situs of an employee's work in determining if a wage law applies, not where managerial decisions, actions, or inactions occur.").

The plaintiffs argue that the Wage Act is nonetheless applicable for two reasons. First, they contend that the Wage Act applies because the SPA, DCAs, and Reallocation Agreement "are governed by and construed in accordance with the law of the State of Delaware."[58] But "the fact that a contract contains a Delaware choice-of-law provision has no bearing on where the contract is made or performed."[59] The Delaware choice of law provisions here do not permit the Founders to press a claim under the Wage Act.

Second, the plaintiffs assert that the Wage Act applies because the SPA, DCAs, and Reallocation Agreement were "partly performed" in Delaware.[60] They argue that partial performance in Delaware occurred "because the Founders facilitated work and delivered services in Delaware for the University of

---

[58] Pls.' Answering Br. 13 (quoting Compl. ¶ 174).

[59] *Hirtle Callaghan Hldgs. v. Thompson*, 2020 WL 5820735, at *7 (E.D. Pa. Sept. 30, 2020); *see also FdG Logistics LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842, 855 (Del. Ch. 2016) (holding that a Delaware choice of law provision did not import "every provision of Delaware statutory law into the commercial relationship of contracting parties"), *aff'd* 148 A.3d 1171 (Del. 2016) (TABLE); *Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, 2014 WL 2457515, at *18 n.136 (Del. Ch. May 30, 2014) ("Certainly, an analysis of whether the Delaware Securities Act applies is an application of Delaware law and therefore complies with the choice of law provision. However, Eurofins's argument is not responsive to the issue of whether it alleged a nexus to Delaware."); *Hadfield v. A.W. Chesterton Co.*, 2009 WL 3085921, at *3 (Mass. Super. Sept. 15, 2009) (noting "that contractual choice of law provisions do not defeat the presumption against extraterritorial application of state wage statutes").

[60] *See* Pls.' Answering Br. 17–23.

14

Delaware."[61]  Essentially, the plaintiffs posit that the location of the customer—not the location of the employee—should determine which state's employment laws apply.  To support this theory, the plaintiffs equate the "partly" performed language in Section 1101(a)(3) of the Wage Act with Delaware's long-arm statute, 10 *Del. C.* § 3104, contending that if an employee "facilitate[s] work or transact[s] business in Delaware," they may avail themselves of the Wage Act.[62]

But the purposes of the long-arm statute and the Wage Act are fundamentally different.  The long-arm statute ensures that Delaware's exercise of personal jurisdiction over a non-resident is consonant with due process.[63]  The Wage Act, on the other hand, "was enacted by the General Assembly in 1965 (55 Del. Laws, Ch. 19) to provide for payment of wages and to enforce their collection."[64]  The apparent "[l]egislative intent was to leave it to the Courts to decide, in any given case, whether a person is or is not an employee" for purposes of the statute.[65]

---

[61] *Id.* at 17.

[62] *Id.* at 18 n.8.

[63] *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *7 (Del. Ch. Nov. 21, 1995) (questioning whether "contacts with Delaware would provide either a statutory or a constitutionally sufficient basis" to require adjudication in Delaware under Section 3104).

[64] *State ex rel. Christopher v. Planet Ins. Co.*, 321 A.2d 128, 132–33 (Del. Super. 1974); *see also Rypac Packaging Mach. Inc. v. Coakley*, 2000 WL 567895, at *13 (Del. Ch. May 1, 2000).

[65] *Fairfield Builders, Inc. v. Vattilana*, 304 A.2d 58, 60 (Del. 1973).

There is no reason to conclude that the reach of the Wage Act is—or should be—coterminous with the application of Delaware's long-arm statute. The plaintiffs have cited no case (and the court is aware of none) supporting the theory that the minimum contacts of facilitating work or delivering services remotely to customers in Delaware, which could potentially provide a basis for personal jurisdiction, can trigger the application of the Wage Act. Delaware "cannot regulate the wages of an individual working in another state" or "enforce its vision of appropriate employment law regulation within" another state's territory.[66]

The plaintiffs' customer-nexus theory is also unworkable in practice. It would mean that employees who "facilitate work or transact business"[67] with customers in multiple states could be subject to numerous and potentially conflicting employment law regimes.[68] Because the plaintiffs "did not work wholly or partly within Delaware,"[69] the Wage Act does not apply to them. Count VII is dismissed.

---

[66] *Klig*, 36 A.3d at 797–98.

[67] Pls.' Answering Br. 18 n.8.

[68] Counsel for the plaintiffs could not estimate how many customers the Founders served while employed by Ford and Journey. *See* Hr'g Tr. 23–24 (June 3, 2021) (Dkt. 65). Hypothetically, if Journey had customers in 50 states, the plaintiffs' interpretation of the law would mean that the Founders could avail themselves of 50 different wage statutes.

[69] *Klig*, 36 A.3d at 797. Because the court finds the Wage Act inapplicable to the Founders, the parties' other arguments as to Count VII need not be addressed.

**B.      Claims for Breach of the SPA and the Reallocation Agreement**

Plaintiffs next assert that Journey and Ford breached Schedule 7.14 of the SPA and the Reallocation Agreement "by improperly purporting to terminate each Founder for Cause when there was no Cause as defined in the DCAs to terminate any Founder."[70]   In doing so, the plaintiffs contend that Ford "prevent[ed] the Founders from satisfying the 2020 performance metrics included in Schedule 7.14 and payable by March 15, 2021,"[71] depriving the plaintiffs of the second tranche of bonus payments.  The plaintiffs' claim lacks a contractual underpinning and fails based on the plain language of the SPA and the Reallocation Agreement.

Although this count is for breach of the SPA and the Reallocation Agreement, the plaintiffs' arguments rest on "[c]ombin[ing]" those agreements with the "Cause" provisions in the DCAs.[72]   Sections 4.a and 4.e of the DCAs detail two distinct vesting outcomes depending on whether a Founder is terminated with or without "Cause."  Under Section 4.a of the DCAs, if a Founder is terminated "without Cause" or resigns "for Good Reason" as defined in the agreement, that Founder's unvested deferred consideration "will vest effective as of the date of his or her employment termination."[73]   Alternatively, if a Founder is terminated "for Cause" or resigns

---

[70] Compl. ¶ 142.

[71] *Id.* ¶ 143.

[72] Pls.' Answering Br. 36.

[73] Compl. Ex. A § 4.a.

"without Good Reason," that "Founder will forfeit any portion of the Aggregate Founder Deferred Consideration Amount that has not vested as of the date of his or her employment termination."[74]

Unlike the DCAs, the SPA and the Reallocation Agreement do not distinguish between "without Cause" and "for Cause" terminations. The Reallocation Agreement provides that Journey employees will only receive their "Transaction Bonus payments" if two conditions are met: (i) "the performance targets are attained, *and* [(ii)] *the employee is still employed with the Company on each payment date*."[75] Similarly, the Transaction Bonus Agreements that were "executed in connection with the Transaction Bonus"[76] provide that each Founder will only receive their "Transaction Bonus payments if the performance targets set forth below are attained, *and the Employee is still employed with the Company Group on each payment date*."[77]

The plaintiffs assert that the Transaction Bonuses contemplated by the Transaction Bonus Agreements "are a modification of Section 7.14 of the SPA and Schedule 7.14."[78] But Section 7.14 of the SPA contains little mention of the

---

[74] *Id.* § 4.e.

[75] Compl. Ex. D at 1 (emphasis added).

[76] *Id.*

[77] O'Toole Decl. Ex. 1 § 3 (emphasis added).

[78] Pls.' Answering Br. 36.

Founders' continued employment with Journey, except to provide that "nothing in this Section 7.14 shall create any rights in any employees of the Company."[79] The plaintiffs point to nothing in Section 7.14—or the SPA as a whole—that distinguishes between a "for Cause" or "without Cause" termination. Nor could they. No such language is found in the agreement.

In short, the SPA and the Reallocation Agreement lack a for cause/without cause distinction.[80] And the "Cause" provisions of the DCAs cannot be "[c]ombined" with those contracts.[81] Each contract must be read on its own terms.[82] Delaware courts construe contracts "as a whole and giving effect to all its provisions," placing priority on parties' "intentions as reflected in the four corners of the agreement."[83] The plaintiffs' attempt to read provisions of the DCAs into separate agreements violates these principles and cannot support a claim for breach of the SPA or the Reallocation Agreement.

---

[79] Compl. Ex. B § 7.14.

[80] *See* Hr'g Tr. 32 (counsel for the plaintiffs arguing that cause requirement in the DCAs should be "import[ed] . . . into the transaction bonus agreement").

[81] Pls.' Answering Br. 36.

[82] *See, e.g.*, *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, 2021 WL 305741, at *9 (Del. Ch. Jan. 29, 2021); *In re Energy Transfer Equity L.P. Unitholder Litig.*, 2017 WL 782495, at *10 (Del. Ch. Feb. 28, 2017) (holding that "each specific agreement must be interpreted in accordance with its own terms").

[83] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

The for cause/without cause distinction in the DCAs is also inconsistent with the terms of the Reallocation Agreement. The Reallocation Agreement requires that the Founders must still be "employed with the Company on each payment date" to receive the "Transaction Bonus payments."[84] That unambiguous and unconditional requirement would become superfluous if the "Cause" provisions in the DCAs were read into it.

For these reasons, Count III fails to state a claim for relief and is dismissed.

### C. Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

The plaintiffs largely repackage their breach of contract claims as a claim for breach of the implied covenant of good faith and fair dealing in the DCAs, the SPA, and the Reallocation Agreement.[85] The plaintiffs assert that those agreements each contain an "implied term" that the defendants would not "terminate any Founder in bad faith or classify any termination of any Founder as for Cause in bad faith."[86]

---

[84] Compl. Ex. D at 1.

[85] *See* Compl. ¶¶ 145–160.

[86] *Id.* ¶ 154; *see also id.* ¶ 158 (alleging that the terminations were "part of a larger scheme to oust the Founders from Journey and deprive the Founders of the Deferred Consideration owed to them under the DCAs and the Transaction Bonuses owed to them under the SPA, and Transaction Bonus Plan Reallocation Agreement").

20

"Under Delaware law, the implied covenant of good faith and fair dealing inheres in every contract."[87]  To sustain a claim for a breach of the implied covenant, a plaintiff "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[88]  "The implied covenant of good faith and fair dealing embodies the law's expectation that 'each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.'"[89]

Although the Complaint treats the relevant contracts collectively for purposes of Count IV, my analysis is different for the DCAs, on one hand, and the SPA and the Reallocation Agreement, on the other.  I will address the plaintiffs' implied covenant claim under the DCAs first, and then address the SPA and the Reallocation Agreement together.

1.    The DCAs

In the employment context, "[c]ourts have been reluctant to recognize a broad application of the [implied] [c]ovenant out of a concern that the [c]ovenant could

---

[87] *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009).

[88] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[89] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) (quoting *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

thereby swallow the [d]octrine [of at-will employment]."[90]  The Delaware Supreme

Court has found that the implied covenant does not create a cause of action where

an employee is terminated "based solely on personal motivations."[91]  Relatedly,

"[d]islike, hatred or ill will, alone, cannot be the basis for a cause of action for

termination of an at-will employment."[92]

These principles cut against finding an "implied" term in the DCAs regarding

bad faith terminations.  The subject of the implied covenant claim is seemingly

covered by the "Cause" provisions in the DCAs.[93]  Logically, if an employee is

properly terminated for cause under a contract, the employer's subjective

motivations would be meaningless.  And if the employer cited cause but had none,

the termination would ultimately be without cause and contract provisions

addressing the consequences of a without cause termination would apply.  At the

pleadings stage and drawing all reasonable inferences in favor of the plaintiffs,

---

[90] *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442 (Del. 1996).

[91] *Id.* at 444.

[92] *Id.*

[93] *See, e.g.*, *Alliance Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.,* 963 A.2d 746, 770
(Del. Ch. 2009) ("[T]he implied covenant only applies where a contract lacks specific
language governing an issue and the obligation the court is asked to imply advances, and
does not contradict, the purposes reflected in the express language of the
contract."), *aff'd*, 976 A.2d 170 (Del. 2009); *Dave Greytak Enters., Inc. v. Mazda Motors
of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992) (explaining that the implied covenant does
not apply when "the subject at issue is expressly covered by the contract"), *aff'd*, 609 A.2d
668 (Del. 1992).

however, I cannot find that the plaintiffs would not be able to recover under any reasonably conceivable set of circumstances.

In *Sheehan v. AssuredPartners, Inc.*, the court declined to dismiss an implied covenant claim based on employment agreements that—like the DCAs here—detailed different outcomes should the employees be fired "with or without Cause."[94] The court explained that although the employment agreements "lay out two types of terminations and a process applicable to each," the employees nevertheless "identifie[d] a possible gap" in the agreements—namely, "that a termination will not be done in 'bad faith.'"[95] Likewise, in *Smith v. Scott*, the court allowed an implied covenant claim based on an employment agreement and certain LLC agreements to survive a motion to dismiss.[96] The court (relying on *Sheehan*) found that a gap potentially existed because the operative contracts failed "to define what is to occur when a party to the contract invokes the 'cause' provision in bad faith to avail itself of the contractual consequences of a for 'cause' termination."[97]

---

[94] *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *3 (Del. Ch. May 29, 2020).

[95] *Id.* at *11.

[96] *Smith v. Scott*, 2021 WL 1592463, at *6–9 (Del. Ch. Apr. 23, 2021).

[97] *Id.* at *8. The defendants contend that *Sheehan* and *Smith* are inapplicable because the Founders "have pled no facts tending to show that Ford falsified any records, or that Ford manufactured 'fictitious grounds' for their terminations." Defs.' Reply Br. 24 (Dkt. 29). That reading of *Sheehan* and *Smith* is too narrow. Neither case requires that a plaintiff plead magic words about falsifying records or manufacturing cause. Both cases provide that "Cause" provisions like those in the DCAs do not contemplate terminations "in bad

23

Here, the plaintiffs allege that the defendants "acted in bad faith by terminating each Founder for Cause when, in fact, no Cause existed" as part of a "scheme to wrongfully pocket roughly $12 million it promised to pay the Founders."[98] The factual allegations in the Complaint provide that the "Cause" the defendants advanced when terminating the Founders was a pretext to cut costs and hide losses from failed acquisitions.[99] Applying the reasoning in *Sheehan* and *Smith*, these allegations are (narrowly) sufficient to state a claim.[100]

### 2. The SPA and the Reallocation Agreement

As explained above, the SPA and the Reallocation Agreement do not include the "Cause" distinctions present in the DCAs.[101] Instead, the Reallocation Agreement provides that each Founder must be "still employed with the Company on each payment date" to receive their "Transaction Bonus payments."[102] The relevant question for my analysis of Count IV as it pertains to the SPA and the

---

faith" or for an "improper purpose." *Smith*, 2021 WL 1592463, at *7–8; *see Sheehan*, 2020 WL 2838575, at *11.

[98] Compl. ¶¶ 1, 3.

[99] *See id.* ¶¶ 40–49.

[100] *But see Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 896 (Del. 2015), *as revised* (Mar. 27, 2015) (Strine, C.J.) (reversing judgment entered after trial in favor of buyer for breach of the implied covenant; explaining that the challenged conduct was "either a breach of the Termination Provision or not a breach at all if one of the exceptions applied").

[101] *See supra* Part II.B.

[102] Compl. Ex. D at 1.

Reallocation Agreement is whether there was an implied term that the defendants would not terminate the Founders in bad faith.

Beyond its gap filling function, the implied covenant applies "when a party to the contract is given discretion to act as to a certain subject and it is argued that the discretion has been used in a way that is impliedly proscribed by the contract's express terms."[103] The Delaware Supreme Court has explained that "the mere vesting of 'sole discretion' d[oes] not relieve the [party] of its obligation to use that discretion consistently with the implied covenant of good faith and fair dealing."[104] Although contracts often grant wide—if not unfettered—discretion to one party, "the law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith."[105]

Even though the SPA and the Reallocation Agreement grant the defendants the ability to terminate the Founders for any reason, it stands to reason that the implied covenant prevents that right from being exercised in bad faith.[106] Applying the Rule 12(b)(6) standard, the Complaint adequately alleges that the defendants terminated the Founders in bad faith as "part of a larger scheme to oust the Founders

---

[103] *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 504 n.93 (Del. 2019).

[104] *Miller v. HCP Trumpet Invs., LLC*, 2018 WL 4600818, at *1 (Del. Sept. 20, 2018) (TABLE).

[105] *Amirsaleh*, 2008 WL 4182998, at *1.

[106] *See id.*

25

from Journey and deprive the Founders of . . . the Transaction Bonuses owed to them under the SPA, and Transaction Bonus Plan Reallocation Agreement."[107]  Those well-pleaded allegations are sufficient to state a claim for breach of the implied covenant.

The defendants' motion to dismiss is therefore denied as to Count IV.

### D.  Claim for Unjust Enrichment

Finally, the plaintiffs contend that Ford was unjustly enriched "by improperly terminating each Founder for Cause without a valid basis to do so"[108] and "relying on that pretext to refuse to pay the Founders the Deferred Consideration it owes them under the DCAs and the Transaction Bonuses it owes them under Schedule 7.14 of the SPA and the Transaction Bonus Plan Reallocation Agreement."[109]  This count recasts the plaintiffs' breach of contract claims as a claim for unjust enrichment. Perhaps acknowledging that reality, the plaintiffs ask that "this claim . . . survive in the alternative if this Court finds that Defendants [sic] failure to pay the Transaction Bonuses did not breach any express contract."[110]

To state a claim for unjust enrichment, a plaintiff must prove: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and

---

[107] Compl. ¶ 158.

[108] *Id.* ¶ 164.

[109] *Id.* ¶ 162.

[110] Pls.' Answering Br. 38.

26

impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law."[111]   Before a court engages in this analysis, however, it must consider the threshold question of "whether a contract already governs the relevant relationship between the parties."[112]   "When the complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed."[113]

Here, the various agreements between Ford, Journey, and the Founders comprehensively address the relationship between the parties.[114]   Because their relationships are governed by contractual provisions—whether express or implied— the plaintiffs cannot maintain a separate claim for unjust enrichment.  Count VI is dismissed.

---

[111] *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999).

[112] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009).

[113] *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006).

[114] *See Nemec v. Shrader*, 2009 WL 1204346, at *6 (Del. Ch. Apr. 30, 2009) ("Delaware courts . . . have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract."), *aff'd*, 991 A.2d 1120 (Del. 2010).

## III. CONCLUSION

For the reasons explained above, the defendants' partial motion to dismiss is granted in part and denied in part. The motion is granted as to Counts III, VI, and VII. The motion is denied as to Count IV.